**Opinion issued August 3, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-21-00439-CR

———————————

## DARRELL ANTHONY ADELL, JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 149th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 87429-CR**

---

## MEMORANDUM OPINION

A jury found appellant, Darrell Anthony Adell, Jr., guilty of the felony offense of murder[1] and assessed his punishment at confinement for life. In sixteen issues, appellant contends that the evidence is legally insufficient to support his

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b), (c).

conviction, his appeal should be abated, and the trial court erred in denying his motion to suppress evidence, admitting certain evidence, and denying his motion for mistrial and motion for new trial.

We affirm.

## Background

### *Complainant's Mother*

Yolanda Cantu testified that she was the mother of the complainant, Trish Rodriguez, who was thirty-nine years old at the time of her death. According to Yolanda, after the complainant graduated college, she worked at Dow Chemical at the Lake Jackson office. Yolanda and the complainant's sister, Monica, previously lived with the complainant at the complainant's house located at 54 Greenvale Court in Lake Jackson, Texas. When the complainant married Robert Rathkamp, he moved into the complainant's home with the complainant, Yolanda, and Monica. Eventually, the complainant and Rathkamp separated and divorced after the complainant became pregnant with appellant's child. After becoming pregnant, the complainant stopped "hear[ing] from" appellant, and the complainant subsequently terminated her pregnancy.

Later, after the complainant's divorce, the complainant and appellant entered into a relationship, and the complainant became pregnant again with appellant's child. The complainant was excited about the baby and had "always wanted to

2

have a baby." "[A]t first," appellant was "around" during the complainant's pregnancy, but when the complainant found out that appellant had "another girlfriend," the complainant and appellant stopped "seeing each other." Appellant did not attend any doctors' appointments with the complainant during her pregnancy. The complainant's child, T.A.A.R. (the "child"), was born on February 6, 2017. After the child's birth, the complainant called appellant. The child lived with the complainant, Yolanda, and Monica at the complainant's house following his birth.

When the complainant returned to work after the child's birth, the child went to "Kool Kidz" daycare. The daycare was not far from the complainant's home— about five minutes away. The daycare was also close to the complainant's work,[2] and the complainant would leave work during the day to visit the child and to breastfeed him when he was an infant. The complainant "always check[ed] on [the child] on her breaks" from work.

According to Yolanda, the complainant normally dropped the child off at daycare, and the complainant normally picked the child up from daycare. Occasionally, appellant would pick the child up from daycare. When the complainant had to travel for work, appellant was responsible for dropping the

---

[2] Yolanda testified that the complainant's office was about ten minutes from the complainant's home.

child off at daycare in the morning because the child would be staying with appellant while the complainant traveled.

Yolanda further testified that she and Monica continued to live with the complainant until November 2017. And after she and Monica moved out of the complainant's home in November 2017, the complainant and the child lived there together. In December 2017, Yolanda became aware that the complainant and appellant were back in a relationship.

In January 2018, appellant moved into the complainant's home. After appellant moved into the complainant's home, Yolanda's visits with the complainant and the child decreased, and she only visited when appellant was not around. Appellant and the complainant remained in a relationship until December 2018.

At some point in early 2019, Yolanda learned that the complainant and appellant were no longer in a relationship. The complainant seemed upset about the breakup but also relieved. The complainant was the person that ended the relationship, and she "seemed more herself" and happier. She "seem[ed] like she was going to be able to finally move on."

On February 9, 2019, Yolanda attended a birthday party for the child at appellant's house in Angleton, Texas. Appellant had purchased his house around November 2017. In February 2019, the house appeared to be "under construction."

4

On February 15, 2019, Yolanda saw the complainant and the child, and the complainant told Yolanda that she had asked appellant to leave her house. The complainant said that "she was going for full custody and child support but that [appellant] mustn't know until right before the [court] date."[3] The complainant specifically told Yolanda that appellant "couldn't know about the child support until right before the court date," which was supposed to be at the beginning of March 2019. The complainant also told Yolanda that her relationship with appellant "wasn't meant to be." And she said: "Mama, I can't tell you what he did to me. I just can't tell you." The complainant was trembling when she said that. The complainant and Yolanda discussed changing the locks to the complainant's home, but they were not changed prior to the complainant's death.

Yolanda subsequently saw the complainant on February 16, 2019 and on February 17, 2019. On February 17, 2019, the complainant spent some time loading appellant's "stuff" from the complainant's home into her sport utility vehicle ("SUV"). When Yolanda left the complainant's home on February 17, 2019, the complainant was going to go to appellant's home to drop off his things. Yolanda either spoke to the complainant on the telephone or communicated with the complainant by text message on February 18, 2019. Yolanda and the complainant made plans to spend the day together on February 22, 2019, along

_____

[3] Yolanda noted that previously in 2017, the complainant had asked for child support, but "child support [was not] established" then.

5

with the child and Monica. The complainant also had plans to see a friend on February 22, 2019 for a playdate with the child at about 3:00 p.m.

On February 19, 2019, the complainant came to Yolanda's house with the child to cook dinner. While at Yolanda's home, the complainant discussed that appellant would be picking up the child from daycare on February 21, 2019 because the complainant was meeting up with her friend, Bryn Mikel. But the complainant was still going to take the child to daycare on the morning of February 21, 2019. The complainant and the child left Yolanda's home about 8:45 p.m. or 9:00 p.m. on February 19, 2019 and went home. The complainant called Yolanda when she arrived home that night. Before the complainant left on February 19, 2019, Yolanda reminded her to lock all the doors and windows at her house, and the complainant responded: "Yes, [m]ama."

On February 20, 2019, Yolanda spoke to the complainant on the telephone twice. Yolanda believed, based on her conversations with the complainant, that the complainant planned to eat dinner with the child at her home that night. The last time that Yolanda spoke to the complainant was on February 20, 2019.

Yolanda explained that on February 21, 2019, she did not hear from the complainant. At about 8:30 a.m., Yolanda became concerned because the

6

complainant had not called her that morning, which was unusual.[4] Yolanda called the complainant repeatedly and sent her multiple text messages. At 5:00 p.m., Yolanda left work and went straight to the complainant's home.

When Yolanda arrived, she saw the complainant's SUV in the driveway, which was unusual. Yolanda went to the front door of the complainant's house and found it unlocked. The glass storm door attached to the wooden front door was also unlocked and a pair of keys was in the lock of the wooden front door. The wooden front door was slightly open, and the whole house was dark. It was unusual for the complainant's house to be dark if the complainant was home.

Yolanda walked into the primary bedroom. She heard "water running," so she went into the primary bathroom and turned on the light. She saw the complainant's body in the bathtub.[5] When she touched the complainant, the complainant was "ice-cold." Yolanda started screaming, rushed to the living room, and called for emergency assistance.[6]

---

[4] Yolanda testified that the complainant called her every morning before work while she was driving the child to daycare.

[5] The trial court admitted into evidence photographs of the complainant's body in the bathtub.

[6] The trial court admitted into evidence the audio recording of Yolanda's telephone call for emergency assistance. During the call, Yolanda stated that she had not heard from the complainant all day and she had come to the complainant's house. The complainant was naked, "ice-cold," and bleeding, and "[t]here was no way that [the complainant] could have killed herself." Yolanda stated that she did not know the whereabouts of the child, who was two years old at the time.

7

As to the complainant's general behaviors, Yolanda explained that the complainant always ate healthily. She was not clumsy and was very athletic. The complainant never left the front door open to allow a visitor to just walk into her house. And she never left a key in her front door to allow someone to let himself in even if she knew the person was coming over. The complainant kept her home locked. She would not have left the front door to her house open all day.

According to Yolanda, the key that opened the wooden front door of the complainant's house fit the home's other exterior doors, including the back door and the side door in the primary bedroom; every door used the same key except for the glass storm door that was attached to the wooden front door on the complainant's home. And the complainant did not drink wine or champagne in the bathtub. As to appellant, Yolanda stated that she had never seen appellant "get physical" with the complainant.

### Complainant's Friend Weaver

Patricia Weaver testified that she worked at Dow Chemical and she met the complainant around 2011 or 2012. After a while of working together, she and the complainant became friends. In 2012, the complainant was married to Rathkamp, but she later got divorced. After the complainant's divorce, Weaver learned that the complainant was seeing appellant, but there were times when the complainant and appellant "were not seeing each other."

In 2016, Weaver found out that the complainant was pregnant with the child. The complainant was excited about her pregnancy. But, when Weaver met appellant in 2016, she felt that the complainant "was much more smitten with him than he was with her." In October 2016, the complainant came to speak to Weaver, and the complainant was very upset. She told Weaver that appellant had been cheating on her.

When it was time for the complainant to give birth to the child, Weaver drove her to the hospital, accompanied by Yolanda and Monica. Appellant came to the hospital after the complainant had given birth to the child.

Around February 11, 2019, Weaver spoke to the complainant about her relationship with appellant. Weaver told the complainant that if appellant "was cheating on her again that she should . . . get legal things settled with him with regard[] to [the child]." Weaver and the complainant also discussed appellant moving out of the complainant's home. Weaver told the complainant that "it would be best if she had an amicable split with [appellant] . . . and then she could go on with permanent changes to her home, like changing [the] locks."

Weaver saw the complainant on February 17, 2019, and the complainant was very happy. By that time, appellant was living in his home in Angleton, and the complainant was living at her house with the child.

When Weaver saw the complainant for lunch on February 19, 2019, though, the complainant's mood had shifted; she appeared concerned. Weaver saw the complainant again on February 20, 2019, and she appeared "very antsy, very nervous." Weaver offered to let the complainant stay at her house on the night of February 20, 2019, but the complainant declined the offer.

On February 21, 2019, Weaver did not see the complainant at work. Weaver thought it was unusual that the complainant missed a work meeting that morning because the complainant always called Weaver when she was not going to come to work, yet she had not called.

In the afternoon, Weaver went to the complainant's office because other co-workers had noticed that the complainant was not at work. The complainant's office was dark, and the door was locked. Weaver spoke to other co-workers, including the complainant's supervisor, and no one had seen her at work. When Weaver checked the complainant's work calendar, the complainant had a full day of meetings scheduled for that day, which she had missed.

The complainant was a responsible person, and she would not have intentionally missed a full day of work meetings. Weaver attempted to call the complainant and sent her text messages. Weaver and Sandra Springs, another co-worker and friend, decided to go to the complainant's home to see if she was okay.

When Weaver arrived at the complainant's house on February 21, 2019, it was dark, but Weaver saw the complainant's SUV at the house. Weaver initially drove past the complainant's house. When she drove back by the house, another car was parked outside. Weaver rolled down her windows, and she could hear "someone screaming that [the complainant] was dead." Weaver saw Yolanda and Monica come out of the complainant's house.

As to the complainant generally, Weaver testified that the complainant had surveillance video cameras installed at her home and she was able to check the surveillance video cameras through an application on her cellular telephone. The complainant was excited about her career and had future career goals.

## Complainant's Friend Springs

Springs testified that she worked at Dow Chemical and she met the complainant there around 2004 or 2005. Over the years, Springs and the complainant developed a friendship. When Springs would visit the complainant's home, she would "walk up to the door and knock on the glass [storm] door," which was usually locked. The complainant did not leave a key in the front door of her home. And Springs never let herself into the complainant's home herself. The complainant kept her home well-lit.

Previously, the complainant lived with Yolanda and Monica, and eventually Rathkamp, the complainant's husband, moved in. After the complainant got

11

divorced, Springs learned, around 2015 or 2016, that the complainant was dating appellant.[7]

In 2016, the complainant became pregnant with the child, and appellant was the father. The complainant was very excited about the pregnancy. At the beginning of the pregnancy, the complainant and appellant were in a relationship, but at some point during the complainant's pregnancy, the relationship ended. After the child was born and the complainant had returned to work, Springs learned that the complainant and appellant "were trying to work things out." In 2018, appellant moved into the complainant's house, and Yolanda and Monica moved out. Appellant lived with the complainant for a little over a year. Appellant moved out of the complainant's home in February 2019.

During Springs's last conversation with the complainant, she asked the complainant if she would be Springs's "backup driver to take [her] to [her] dental surgery" on February 22, 2019 if Springs's husband was unable to do so. The complainant told Springs that she would rearrange her schedule for Springs if Springs's husband could not drive her to the surgery.

On February 21, 2019, Springs attempted to contact the complainant at work about giving her a ride to her surgery the next day. Springs tried to contact the complainant through an internal messaging system at work, but the system never

---

[7]    Springs noted that she later learned that the complainant had an affair with appellant during her marriage to Rathkamp.

12

showed that the complainant was at work that day. Springs also called the complainant and sent her text messages later in the day, but she did not receive a response. It was unlike the complainant to not show up when she was supposed to be somewhere.

When Springs could not get ahold of the complainant, she had another co-worker go by the complainant's office. The co-worker found the office door locked and the lights off. This concerned Springs because it was unusual behavior for the complainant. Eventually, Springs and Weaver decided to go to the complainant's home.

At the complainant's house, Springs saw the complainant's SUV in the driveway. After initially driving by the complainant's house, Springs returned and saw Yolanda's car there. Springs saw the front door to the complainant's house open. Yolanda came out yelling that the complainant "was dead." Yolanda also said that appellant "did this." (Internal quotations omitted.)

### *Complainant's Friend Mikel*

Mikel testified that the complainant was one of her best friends. Mikel previously worked at Dow Chemical and met the complainant through work. Whenever Mikel went over to the complainant's home, she would knock on the front door or ring the doorbell. The complainant did not leave a key in the front

13

door for Mikel to use to come in on her own. Mikel also noted that the complainant was not clumsy.

According to Mikel, while the complainant was married to Rathkamp, she became pregnant, but appellant,[8] not Rathkamp, was the father of her child. The complainant terminated that pregnancy. The complainant told Mikel that she had "been with" appellant while she was married.

In 2016, the complainant became pregnant again. Appellant was the child's father. During the complainant's pregnancy, her relationship with appellant was "on and off." Mikel described the complainant and appellant's relationship as "very tumultuous." At one point while the complainant was pregnant, the complainant "found out that [appellant] was seeing another woman," and she stopped speaking to appellant after that. The complainant did not tell appellant that she gave birth to the child until after the child was born.

After the child's birth, the complainant and appellant did not immediately resume their relationship. Around the child's first birthday, appellant reached out to the complainant about "try[ing] [to] have [a] relationship again." "[A]ll [the complainant] wanted was for them to be a family and [to] have a family for [the child]." The complainant "really wanted to make [the relationship with appellant] work." Mikel noted that the timing of appellant's renewed interest in a

---

[8] Mikel stated that she had met appellant at work while appellant worked at Dow Chemical.

14

relationship with the complainant "seemed odd" because it coincided with the complainant and appellant's discussions to "renegotiate" their custody and support agreement related to the child. Appellant appeared "opportunistic." But the complainant decided to enter into a relationship with appellant again.

At some point after the complainant resumed her relationship with appellant, Yolanda and Monica moved out of the complainant's home, and appellant moved in. As to the complainant's relationship with appellant, Mikel stated that "[t]here w[ere] always . . . problems going on and trouble." But the complainant stayed with appellant because she "really want[ed] to make [it] work." By late 2018 though, the complainant had realized that the relationship was "not going to work" and she "need[ed] to move on."

Mikel stated that during the complainant's relationship with appellant it was "more difficult" to spend "time with her because [the complainant] would kind of have . . . restrictions" and "could only meet" on certain days.[9] Mikel and the complainant had to make plans far in advance to see each other. If Mikel and the complainant ever planned to get together and the complainant needed to cancel, she would always tell Mikel. She would never just not show up.

---

[9] Mikel noted that while the complainant was in a relationship with appellant, she spent less time with her family. Appellant's demeanor with the complainant's family was "cold." He was not "family-friendly."

15

According to Mikel, she and the complainant mainly communicated through text messages. And the complainant was very responsive to Mikel's text messages. On February 20, 2019, Mikel and the complainant had a text message conversation about their plans to go to a salon and then to dinner on the evening of February 21, 2019. In that text message conversation, they spoke about how they could not wait to see each other the next day.

On February 21, 2019, Mikel sent the complainant a text message in the morning to tell the complainant "how excited [she] was to see her." The complainant did not respond, which Mikel thought was weird. Later in the day, Mikel sent the complainant a text message stating that she was "on [her] way to the salon."

When the complainant did not meet her at the salon, Mikel knew that something was wrong. Mikel called the complainant several times, but the complainant did not answer. Mikel then sent a text message to appellant at 5:48 p.m. on February 21, 2019 that said:

> Hey [appellant] it's [Mikel]. I haven't heard from [the complainant] and she was supposed to meet me over 20 minutes ago at our . . . appt. [H]ave you heard from her??

Appellant responded to Mikel's text message at 8:01 p.m., stating:

> No. She messaged me last night but nothing from today. I picked up [the child] this morning and he'll be with me through the weekend but we didn't speak. I believe she is avoiding me. Things have[] been []growing weird since she came back from her last trip.

16

At 8:02 p.m., appellant sent Mikel another text message, saying:

> Did [you] get a hold over [sic] her?  My family is here at the house right now.  We are supposed to have dinner here tomorrow but she hasn't mentioned anything about it.

Mikel responded to appellant's text messages at 8:02 p.m., stating:

> Okay.  Well glad [the child] is safe and sound with you.  I still haven't heard from her and I'm a little worried.  I don't have anyone else's phone number to contact.

Appellant then told Mikel that he would "call [the complainant] after dinner."

### *Complainant's Friend Janeth*

Janeth Rodriguez testified that she worked at Dow Chemical and had met complainant through work.  In October 2017, at a lunch with the complainant, Janeth learned that the complainant and appellant had a child together but were not in a relationship.  From October 2017 onward, Janeth and the complainant stayed in contact.  In 2018, the complainant and appellant "got[] back together."

Janeth attended the child's second birthday party on February 9, 2019, which was held at a house in Angleton.  The complainant and appellant did not interact a lot during the party.  The home where the party was held was being remodeled.

Janeth further testified that she had lunch with the complainant on February 18, 2019.  During their lunch, the complainant said that she and appellant were not in a relationship anymore.  The breakup "was fresh"; the complainant said that she and appellant "had split up the week before."  It was the

17

complainant's decision to end the relationship, and she felt comfortable with her decision. The complainant also expressed concern about Janeth sending her text messages because it appeared that the complainant's text messages were being monitored.

According to Janeth, on February 18, 2019, only the complainant and the child were living at the complainant's home. Appellant "was moving his things out." The last time that Janeth heard from the complainant was on February 18, 2019.

### Complainant's Friend Welch

Lauren Welch testified that she worked at Dow Chemical and had met the complainant at work. Because she and the complainant had children near the same age, they would have playdates together. At some point, after the child was born, Welch learned that the complainant was in a relationship with appellant.

Welch and the complainant had set up a playdate for their children on February 22, 2019. They ran into each other at work on February 19, 2019, and the complainant "looked distressed" and said that they "need[ed] to catch up." That night, Welch reached out to the complainant by text message and asked to get together with her on the afternoon of February 22, 2019. They made plans for the complainant and the child to go to Welch's home that day.

18

During Welch's testimony, the trial court admitted into evidence a copy of the text message conversation between Welch and the complainant, during which they made plans for a playdate on February 22, 2019 around 2:30 p.m. or 3:00 p.m. In her text messages to Welch, the complainant used the letter "u" instead of the word "you." The complainant responded to Welch's text messages promptly.

Welch testified that the complainant never called to cancel their plans for February 22, 2019. Welch found out on the evening of February 21, 2019 that the complainant had died.

***Complainant's Cousin Kimberly***

Kimberly Cantu, the complainant's cousin, testified that while the complainant was married, she had an affair with appellant. The complainant met appellant while they both worked at Dow Chemical. As a result of the affair, the complainant got divorced.

In December 2015, Kimberly became aware that the complainant was in a relationship with appellant again. At some point, the complainant became pregnant, and appellant was the father of the child. The complainant told Kimberly about her pregnancy in August 2016. At the time, the complainant and appellant were still in a relationship, and the complainant was excited about having the child. In November 2016, though, Kimberly learned that the complainant and appellant had broken up because appellant "had another girlfriend in California."

19

The complainant had the child on February 6, 2017. The complainant and appellant were not in a relationship when the child was born. In December 2017, the complainant told Kimberly that she and appellant were back in a relationship. The complainant and appellant's relationship continued into 2018.

In 2018, Kimberly learned that appellant had bought a house in Angleton. But appellant still lived at the complainant's home. In 2018, the complainant also notified Kimberly that she had concerns about her text messages being monitored.

During Kimberly's testimony, the trial court admitted into evidence a copy of a text message conversation between Kimberly and the complainant from June 10, 2018. In the conversation, the complainant told Kimberly: "I need to catch u[10] up on my life" and "[b]ut not over phone or text." Kimberly then asked: "Are things rough with you and A,"[11] and the complainant responded: "Yeppers." Kimberly replied: "Don't tell me they are being monitored." And the complainant said: "Might be[]"[12] and "[i]t's better to talk in person anyways."[13]

Kimberly further testified that the complainant and appellant remained in a relationship through the end of 2018 and into January 2019. But in February 2019,

---

[10]    Kimberly noted that the complainant used the letter "u" instead of the word "you" in her text messages.

[11]    Kimberly testified that "A" meant appellant's name.

[12]    Kimberly testified that the complainant meant that her text messages "[m]ight be" being monitored.

[13]    Kimberly also testified that the complainant used the letter "r" instead of the word "are" in her text messages.

Kimberly learned that the complainant and appellant had broken up. The complainant sent Kimberly text messages on February 16, 2019, which was the last conversation that Kimberly had with the complainant. In those text messages, Kimberly learned that it was the complainant's idea to break up with appellant.

During Kimberly's testimony, the trial court admitted into evidence a copy of Kimberly's text message conversation with the complainant on February 16, 2019. In the conversation, Kimberly asked the complainant if she and appellant were "[r]eady for marriage," and the complainant replied: "Well[] no. He is moving out and I'm staying here. I asked him to leave earlier this week." The complainant further stated that appellant did not "have much left" at her house and that he had "been taking stuff most of the week." The complainant explained:

> I mean it sucks and it hurts but I'm sure this is what is needed[.] He was never going to marry me....I realized that awhile ago[.] So I wanted to get thru holidays and [the child's] birthday and gave myself alot of time to think about it[.]

Further, the complainant told Kimberly that the breakup was her idea. And that she had told appellant that they "should stop and go [their] separate ways and focus on coparenting [the child]," and "[h]e said ok." The complainant told appellant: "[U][14] should move to ur[15] house in angleton and I should stay here and he said

---

[14]    The complainant used the letter "u" instead of the word "you" in her text messages to Kimberly.

[15]    The complainant used the letters "ur" in her text messages to Kimberly.

Ok." The complainant said that she and appellant "r on good terms" but she was "ready to move on with [her] life."

Kimberly testified that at the end of her text message conversation with the complainant on February 16, 2019, she and the complainant made plans for the complainant and the child to visit Kimberly on February 23, 2019. The complainant and the child were going to spend the night at Kimberly's house. Kimberly never received a follow-up text message or telephone call from the complainant canceling their plans.

As to the complainant's behaviors generally, Kimberly testified that the complainant was not clumsy. She did not fall or trip or bump her head on things. When Kimberly would visit the complainant at the complainant's house, the complainant never left a key in the door for Kimberly to use to unlock the door and come into the house. If Kimberly ever found the wooden front door of the complainant's house unlocked, then the glass storm door was always locked. Even when the complainant knew that Kimberly was coming over to visit, Kimberly would still have to ring the doorbell to be let into the complainant's home. And the complainant always had "every light in the house on" if she was home. Kimberly also noted that the complainant had surveillance video cameras at her house.

As to the complainant and appellant's relationship generally, Kimberly testified that the complainant tried to make her relationship with appellant work.

Kimberly did not have any knowledge about appellant ever "beat[ing]" up the complainant. But Kimberly stated that the complainant would not have told her that kind of information because the complainant was "[t]oo proud." Kimberly observed that appellant was emotionally abusive to the complainant. And when the complainant would travel for work appellant would not let her "FaceTime"[16] with the child.

***Complainant's Therapist***

Angela Gaston, a licensed clinical social worker, testified that she had been the complainant's therapist. The complainant began seeing Gaston in 2015, while the complainant was still married to Rathkamp, because she had an affair and "she was trying to sort through her marriage and see what she wanted to do." Eventually, the complainant got divorced, and Gaston became aware that the complainant was in a new relationship with appellant. After that, the complainant's therapy sessions focused on the complainant's relationship issues with appellant.

According to Gaston, the complainant's relationship with appellant was not a healthy one. Appellant was verbally and emotionally abusive. At some point,

---

[16] "FaceTime is a[] [cellular telephone] application that allows individuals to make video calls from telephones. FaceTime also may be run from other electronic devices." *See Perone v. State*, No. 14-12-00969-CV, 2014 WL 1481318, at *2 (Tex. App.—Houston [14th Dist.] April 15, 2014, no pet.) (not designated for publication) (internal footnotes omitted).

the complainant became pregnant. Although "emotionally the [complainant's] relationship [with appellant] was very difficult," the complainant was excited to have a child and to "be a mom."

At one time, Gaston advised the complainant to end her relationship with appellant. And although the complainant "would try" to do so, "something would happen" and the complainant and appellant "would get back together." For instance, appellant would "give [the complainant] a call" or they would "run into each other and start talking again." Gaston stated that appellant gave the complainant "a lot of mixed messages" and he would "talk[] to other women," which upset the complainant. One day, appellant would "want[] to be together and then the next day he didn't." The relationship was "a constant roller coaster." Gaston found appellant's behavior to be manipulative and controlling.

While reviewing portions of her notes from her therapy sessions with the complainant, Gaston stated that appellant did not want to pay child support. The complainant felt "[f]earful of [appellant's] intentions and [the] impact on" the child and she felt that she could not trust appellant. (Internal quotations omitted.) In January 2018, complainant reported to Gaston that appellant was upset with her and she felt "vulnerable and used." (Internal quotations omitted.) Appellant "ha[d] turned her life upside down again." (Internal quotations omitted.)

In May 2018, the complainant told Gaston that she felt appellant was deceitful and had been giving her "mixed messages." (Internal quotations omitted.) The complainant had confronted appellant about his inappropriate relationship with another woman, and appellant "responded by being angry and denying any inappropriate behavior." (Internal quotations omitted.) In June 2018, the complainant reported to Gaston that she felt appellant was "emotionally abusive to her" because he would not allow her to see the child on FaceTime while she was traveling for work. (Internal quotations omitted.) And in September 2018, the complainant expressed that she was fearful of appellant.

Gaston opined that appellant's behavior constituted "emotional blackmail" because it made the complainant "afraid that if she didn't do what [appellant] said," "he would . . . keep the child from her." The complainant was fearful of appellant because he had threatened to take the child and leave so that she would never see the child again.

Gaston also testified that the complainant had turned down promotions at work because appellant did not want her to take a job that required her to relocate. The complainant told Gaston that appellant had "difficulty coping when things d[id not] go his way" and when appellant would "get[] upset," the complainant would try to "be less reactive" so that their conflicts would be less. (Internal quotations omitted.)

Numerous times the complainant told Gaston that she was fearful of appellant, but she did not tell Gaston that appellant physically abused her. However, the complainant did report that appellant had threatened her by saying: "You better not push me," and by referring to "his past and knowing . . . people [who] could . . . harm her." (Internal quotations omitted.) Gaston more specifically explained that appellant "had warned [the complainant] not to push him and that he knew people [who] could make her disappear." And appellant "basically warn[ed] her about his past," by telling her that "he could never talk about [it] because it was so dangerous." The complainant never expressed fear about anyone other than appellant. Appellant never attended a therapy session with the complainant.

During Gaston's testimony, the trial court admitted into evidence copies of Gaston's notes from her therapy sessions with the complainant. In March 2017, the complainant reported that appellant did not want to pay child support related to the child, but they were able to reach a temporary agreement that would be in effect until January 2018. The complainant did not trust appellant and was fearful of appellant's intentions. In January 2018, the complainant reported that appellant had told her that he "wanted to work things out" and she had put going back to "[c]ourt over custody [related to the child] . . . on hold." (Internal quotations

26

omitted.)  She felt "very vulnerable and used" and that appellant had "turned her life upside down again."  (Internal quotations omitted.)

In May 2018, the complainant expressed that appellant was continuing to be deceitful with her, she felt that appellant was manipulative, deceitful, and misleading, and appellant had been engaging in an inappropriate relationship with another woman.  When the complainant confronted appellant about the other relationship, he became angry and denied any inappropriate behavior.  In June 2018, the complainant reported that appellant was continuing "to be emotionally abusive to her and [had] with[held] [the child] from her when she was out of town."  In September 2018, the complainant expressed that appellant "trie[d] to control every aspect of her life," she was "[a]lways afraid of making [appellant] upset," and she was afraid that appellant would not "allow her to see/talk with [the child] when she [was] away" traveling for work.

***Agreed Temporary Order and Motion to Modify Child Support***

Krista Harris, a paralegal who previously worked with the complainant's attorney, William Terry, testified that the complainant had retained Terry to represent her in a suit affecting the parent-child relationship.  Harris noted that when the child was about three months old, a temporary order had been put in place related to the custody and care of the child.  Under the temporary order, appellant was not required to pay child support, but beginning on April 15, 2017,

he was required to pay $750 a month into certain accounts for the benefit of the child.

During Harris's testimony, a copy of an Agreed Temporary Order from May 5, 2017 was admitted into evidence. The Agreed Temporary Order adjudicated appellant to be the father of the child, and it appointed the complainant and appellant as temporary joint managing conservators of the child. The complainant was given the exclusive right to designate the child's primary residence. The Agreed Temporary Order also set forth a custody agreement for the child.

As to child support, the Agreed Temporary Order stated that the complainant and appellant had agreed that no child support would be paid by either party at the time. Instead, the complainant and appellant would open a joint money market account or checking account for the benefit of the child. The purpose of the account was for the child's necessities, such as diapers, clothes, and expenses for the health, education, safety, and welfare of the child. The complainant and appellant were ordered to contribute $300 each per month to the account. The complainant and appellant were also ordered to set up an individual savings account for benefit of the child and for his needs beyond high school. The complainant and appellant were ordered to contribute $450 each per month to that account.

Harris explained that a few days before February 15, 2019, the complainant met with Terry to discuss filing a motion to modify the Agreed Temporary Order and she expressed her desire to seek child support from appellant. On February 15, 2019, Harris called the complainant to ask if the complainant was ready to file the motion to modify. The complainant "said, no, that she had asked [appellant] to move out of [her] residence and she didn't want to file it until he had moved out." The complainant wanted to wait to file the motion to modify until after appellant had "moved out of her home." The complainant said that appellant "would be mad and she wanted to avoid any confrontation." Harris called the complainant again on February 20, 2019 to see if appellant had moved out of the complainant's house. The complainant said that he had moved out and "she wanted to go ahead and file [the motion to modify] to seek . . . child support." The complainant was concerned about when appellant would receive a copy of the motion to modify. She told Harris that appellant would be upset and mad about the motion to modify and she "wanted to be prepared for him to call her." The complainant did not say that she was scared that appellant would physically hurt her. She said that appellant was "going to be angry about the child support so she wanted him to be moved out of the house before she filed [the motion to modify] and once it was filed she wanted to be prepared for when he would get a copy of it."

After speaking with the complainant, Harris filed the motion to modify around 3:00 p.m. on February 20, 2019. Appellant's attorney got notice of the motion to modify immediately after it was filed—meaning appellant's attorney would have been notified a little after 3:00 p.m. on February 20, 2019 that the complainant had filed a motion to modify the Agreed Temporary Order.

During Harris's testimony, a copy of the Motion to Modify Temporary Order, filed by Harris on behalf of the complainant on February 20, 2019 at 3:08 p.m., was admitted into evidence. The motion to modify states that on May 5, 2017, the complainant and appellant entered into the Agreed Temporary Order. Since that time, "financial circumstances ha[d] materially changed" and the complainant was requesting modification of the temporary order. The complainant specifically requested that the support ordered to be paid by appellant in the Agreed Temporary Order "be increased to conform to the guideline amount."[17] A hearing was set on the complainant's motion to modify for March 6, 2019.[18]

Terry testified that the complainant retained him as her attorney in 2016 for "a paternity action" because she was having the child in February 2017 and she wanted to "establish the [child's] biological father and to set out the rights and

---

[17]    Harris testified that "the guideline amount" meant the child support guidelines in the Texas Family Code. According to Harris, for one child, the Texas Family Code required child support to be set at twenty percent of the parent's net income.

[18]    Harris testified that the March 6, 2019 hearing did not go forward because of the complainant's death on February 21, 2019.

duties and obligations of the father." According to Terry, appellant was the child's father. After the child was born, Terry filed the paternity action on the complainant's behalf. At some point in 2017, the complainant and appellant went to court for a hearing about temporary orders. The complainant drafted a proposed agreement related to visitation with the child and child support. At that time, Terry had calculated that appellant would owe about $1,186 a month in child support. As Terry explained, in Texas, "if [someone has] one child, the [child support] obligation is 20 percent of [the] person's net resources," so appellant's child support calculation was based on his "pay stub." Appellant did not agree to the complainant's proposed agreement requiring him to pay child support. But eventually, the complainant and appellant agreed to a temporary order that provided for the complainant and appellant "to set up a joint account for the benefit of the child" and both "to contribute money into the account." While viewing the Agreed Temporary Order, Terry testified that the complainant and appellant agreed to each pay $300 a month into an "Account for Child's Necessaries." (Internal quotations omitted). And the complainant and appellant would each pay $450 a month into an "Account for Beyond High School Needs." (Internal quotations omitted.) Thus, under the Agreed Temporary Order, appellant was to pay $750 each month related to the child. Terry did not know if appellant was actually paying $750 each month like the Agreed Temporary Order required.

Terry further testified that the complainant met with him on February 10, 2019 to request that a motion to modify the Agreed Temporary Order be filed. In the motion to modify, the complainant sought changes to child support and possession and access to the child because a material and substantial change of circumstances had occurred.

In their meeting, Terry learned that appellant had been living with the complainant, but the complainant "wished to change those arrangements." The complainant explained that appellant had been "having contact with other women over the internet" and the complainant "didn't think they were going to make it" as a couple. The complainant also told Terry that she was afraid of appellant, and she was "concerned about [appellant] getting served with [the motion to modify] while he was still in the [complainant's] house." The complainant did not want appellant's attorney to receive the motion to modify until appellant had moved out of her home. Terry agreed not to file the motion to modify until after appellant had moved out.

Terry also explained that the motion to modify was filed on the complainant's behalf on February 20, 2019 and a hearing was set on the motion for March 6, 2019. But that hearing never took place. Terry learned that the complainant had died "within a day of" the filing of the motion to modify. Upon the complainant's death, her case was dismissed.

As to the complainant and appellant's relationship generally, Terry testified that he knew that the complainant "was very afraid of [appellant] and what his actions were capable of and she didn't want to make [appellant] mad." Terry did not recall the complainant ever telling him that appellant had physically harmed her. But she had mentioned appellant's "temper and how mad he would get about certain things and how controlling he was and how he didn't like her being around her family and other people."

Jamie Wilson, a legal assistant who worked for appellant's attorney, Scott Brown, testified that on February 20, 2019, she received a motion to modify from Terry's law firm related to the child. Upon receiving the motion to modify, she informed Brown that the motion had been received, and he asked her to notify appellant that the motion to modify had been filed by the complainant. Wilson called appellant on February 20, 2019 to tell him about the motion to modify. Wilson spoke to appellant on the telephone that day. On the morning of February 21, 2019, Wilson sent appellant a follow-up email, with a copy of the motion to modify attached, and she notified him of the hearing date set for the motion.

During Wilson's testimony, the trial court admitted into evidence a copy of Wilson's February 21, 2019 email to appellant, which was sent at 9:13 a.m.[19] That email states:

> Per our discussion yesterday, please find attached the Motion to Modify Temporary Order[] that our office received from opposing counsel. Note your hearing is set for March 6, 2019 at 9:30 a.m. in the 300th Judicial District of Brazoria County.

The copy of the email admitted into evidence also contains a response email from appellant to Wilson at 12:22 p.m. on February 21, 2019.

### Law Enforcement Officers

#### Officer Mears

Lake Jackson Police Department ("LJPD") Officer C. Mears testified that he was on duty on February 21, 2019 when he was dispatched to 54 Greenvale Court in Lake Jackson, Brazoria County, Texas, at about 5:30 p.m., in response to an emergency-assistance call about "an unresponsive female in a bathtub." When he arrived, he went inside the home and found the complainant in the bathtub in the primary bathroom. The water in the bathtub was "trickling slightly." There was a wine glass on the floor. As Mears walked around the house, he saw a cellular telephone on the bed in the primary bedroom. He also saw keys in the front door

---

[19] Lake Jackson Police Department ("LJPD") Detective R. Pierce testified that a printed copy of this email was found by law enforcement officers in appellant's SUV. A printed copy of the motion to modify filed by the complainant on February 20, 2019 was attached to the email.

34

to the home.  Nothing in the home looked like "someone [had been] trying to burglarize [it]."

*Officer Kimbrell*

Former LJPD Officer T. Kimbrell testified that while on duty on February 21, 2019, he was "called out" to 54 Greenvale Court in response to a medical emergency.  When Kimbrell arrived, he saw keys in the home's front door.  He also noticed a surveillance video camera positioned near the front door of the home.  When Kimbrell went into the primary bathroom, he saw a "body in the tub" and a broken wine glass on the bathroom countertop and on the floor.  The back door to the home was unlocked.

*Detective Pate*

Former LJPD Detective T. Pate testified that on February 21, 2019, he received a call from another law enforcement officer asking him to come to 54 Greenvale Court to assist with "processing the scene" following "a suspicious death."  Pate arrived at the single-story house at about 7:15 p.m.  At the front door to the home, Pate saw a key in the lock that had a "Hawaiian shirt key chain" attached to it.

Detective Pate proceeded to the primary bathroom in the home, where he saw the complainant deceased in the bathtub.  "She was lying on her right side," and she had "a wine or some sort of bottle next to her, kind of in her arms."  The

35

wine bottle had blood and the complainant's hair on it.[20] There was blood in the bathtub, and the complainant was naked and "cold to the touch." When law enforcement officers moved the complainant's hair, they saw that the complainant "had a pretty good size cut on the top of her head." It was "a really jagged gash in her head." The complainant's eye was "bruised and swollen." She was "bleeding from the nose area." And "[s]he was in rigor mortis stage." Pate also saw a broken wine glass on the floor of the primary bathroom, and there were "shards of glass from that [wine glass] on the [bathroom] counter[top]" as well. Pate noted that outside the bathtub were two socks and "a nightgown-style shirt" on the floor that were soaking wet.

Detective Pate explained that based on the scene in the primary bathroom, it did not appear that the complainant had fallen in the bathroom or in the bathtub. And law enforcement officers could not find "any indication that she had [accidentally] hit her head on anything." There were no hand towels in the bathroom and no bathing towels near the bathtub, which would indicate that the complainant was not intending to bathe. Pate believed that the complainant had been "bludgeoned over the head with some object."

---

[20] Detective Pate noted that the bottle was consistent with other wine bottles found in the primary bedroom. Texas Ranger T. Norsworthy testified that no fingerprints were found on the wine bottle, not even the complainant's fingerprints, which was surprising, and led him to believe that the scene in the primary bathroom was staged.

36

Detective Pate further testified that while he was in the primary bathroom, another law enforcement officer used "a Bluestar agent,"[21] which was designed to "reveal[] blood that ha[d] been wiped or washed away."[22] The Bluestar agent was applied to both sinks in the primary bathroom, and "there was a bright, blue glow" on the bathroom countertop "to the left" of the right-side sink and "down" into the sink and "into the drain." There were also "bright blue streaks" on the countertop in front of the right-side sink that led "down the bowl." And there was "a pretty heavy glow of blue puddled" where the "soap dispenser" was located on the bathroom countertop.[23] There was no blood visible to the naked eye on the countertop though. The only toiletries were on the left side of the bathroom countertop; there were no toiletries near the right-side sink.

As to the primary bedroom, Detective Pate explained that there was a wine refrigerator in the bedroom, and the complainant's cellular telephone was found at the foot of the bed. There were some blood droplets on the bed, on the sheets, on a

---

[21] Texas Ranger Norsworthy testified that "Bluestar is a chemical enhancing agent that allows typically nonvisual blood to be seen" and law enforcement officers "use it in . . . crime scenes that have been cleaned up." (Emphasis omitted.)

[22] Detective Pate noted that the Bluestar agent could "glow for [another] liquid [other] than blood." And Texas Ranger Norsworthy testified that the Bluestar agent could give a "false positive[] for irons, rust, . . . turnips, potatoes" and bleach. However, he noted that the presence of bleach at the crime scene could indicate that it was used "to destroy DNA or clean up a crime scene."

[23] Texas Ranger Norsworthy testified that he did not believe that the Bluestar agent caused a "false positive" when it was used in the complainant's primary bathroom that day.

couple of pillowcases, and on the duvet cover. There were also blood droplets along the side of the bed closer to the nightstand, which Pate described as "almost as if [they were] leading to the bathroom." Pate believed that the complainant was injured while she was lying in bed and she was transported to the primary bathroom.

Detective Pate further opined that the scene at the complainant's home was staged to make it look like the complainant was intoxicated. The wine bottle that was in the complainant's arms and the broken wine glass in the primary bathroom looked like they had been placed there after the complainant had died. There was no blood evidence consistent with a slip and fall in the primary bedroom or the primary bathroom. And Pate saw no signs of a "break-in" or a forced entry. The complainant's wallet and laptop were still inside the home.[24]

*Detective Bailey*

Former LJPD Detective S. Bailey testified that on February 21, 2019, he responded to a call at 54 Greenvale Court. Upon arrival, Bailey entered the home through the front door, and he noticed that there was a set of keys in the "dead-bolt lock" in the wooden front door.

---

[24] Detective Pierce also testified that "the person who came into the [complainant's] house did not take her wallet" and "the person who went into [the complainant's] house and killed her did not take [the complainant's] laptop," even though it was "a[n] item of value." The complainant's wallet still had money and credit cards inside when it was found by law enforcement officers in her home.

Detective Bailey went to the primary bathroom and saw the complainant in the bathtub naked. The complainant was cold to the touch, and she "had rigor mortis," which indicated that she had not died "in the preceding few minutes." The water was turned on but was not running at a normal rate. The water was not coming out fast. Bailey noticed blood coming from the complainant's head. There was also blood in the bathtub.

Detective Bailey saw a wine or champagne bottle near the complainant's head and arms. And he noticed a broken wine glass partially on the floor and partially on the countertop in the primary bathroom. There was no evidence that the broken wine glass ever had wine or champagne inside it. This made Bailey feel like "the scene was staged." Bailey did not notice anything in the primary bathroom that would indicate that the complainant was injured due to "a slip and fall."

In the primary bedroom, Detective Bailey saw droplets of blood next to the bed on the floor near the nightstand as well as droplets of blood in the bedding near the head of the bed. This blood did not seem consistent with "any type of accident," such as a slip and fall in the primary bathroom. It also did not appear that the complainant had slipped and fallen in the bed and then walked to the primary bathroom because there was no trail of blood from the bed to the primary bathroom.

Detective Bailey further testified that an inspection of the complainant's house did not indicate that there had been any forced entry. And there was no evidence that "there had been an attempt to burglarize the [complainant's] house." Valuable items were still in plain view in the home. Bailey testified that based on law enforcement officers' investigation, it appeared that the complainant died in the early morning hours of February 21, 2019, "[s]ometime prior to 2:31 a.m."

While speaking with Yolanda at the scene, Detective Bailey learned that the child, who was two years old at the time, also lived in the house with the complainant and that appellant had been living in the complainant's house, but "that living situation" had recently changed. At the time, no one at the scene knew the location of the child. Bailey was given appellant's address, and he and LJPD Detective D. Hawkins drove to appellant's house in Angleton to look for the child and to speak with appellant about the complainant's death.

When Detective Bailey left the complainant's house around 10:00 p.m. on February 21, 2019, he drove with Detective Hawkins to appellant's house in Angleton. It took about fifteen minutes to get to appellant's house from the complainant's home. Upon arrival at appellant's house, Bailey and Hawkins parked outside of the gate, and Hawkins called appellant on his cellular telephone. Hawkins noted that it was weird that appellant did not ask why the law enforcement officers wanted to speak to him. Appellant came outside of his house

and met the officers at the gate. Bailey and Hawkins then notified appellant of the complainant's death. Appellant responded: "You're kidding me" and "hung his head." Bailey and Hawkins told appellant that they needed to check on the safety of the child, and appellant invited the officers into his home to check on the child and to speak with him.

Inside appellant's home, Detective Bailey saw the child sleeping in the family room on "two sofas [that had been] pushed together to keep him from rolling off onto the floor." The child appeared fine, but he was not in a bedroom. Bailey noted that appellant's house was "sparsely furnished," and appellant said that he was remodeling the house and "cleaning it up." Bailey did not smell fresh paint in the house.

While at appellant's house, appellant voluntarily agreed to an interview with the law enforcement officers. Detective Bailey testified that, during appellant's interview on February 21, 2019, appellant told the officers that the child was supposed to stay with him from February 21, 2019 until February 24, 2019. He was supposed to return the child to the complainant on February 24, 2019.[25] Appellant also told the officers that the complainant had sent him a text message at

---

[25] Detective Hawkins testified that appellant's house on February 21, 2019 did not look like it had been prepared for the child to stay there for an entire weekend. Thus, the child staying at appellant's house on February 21, 2019 may not have been a planned decision, but rather a sudden decision. During appellant's February 27, 2019 interview with Texas Ranger Norsworthy, appellant agreed that his home did not appear to be set up for the child to stay with appellant.

2:31 a.m. on February 21, 2019, which appellant stated was strange behavior.[26] And appellant said that it was abnormal for the complainant not to respond to his text messages.

Appellant further told the law enforcement officers that every year he and the complainant went "back to court to review their temporary order[]" related to the child. But he also stated that he was not aware "what changes were coming" to his and the complainant's arrangement related to the child. Appellant told the officers that he had not been served with the complainant's motion to modify. Detective Bailey considered appellant's statement as an attempt to convey that appellant "was not aware of what[] [was] going on" related to the motion to modify.[27]

Detective Bailey also noted that appellant said that he had a key to the complainant's home, and it was normal for the complainant to leave her key in the

---

[26] A copy of the text message from the complainant's cellular telephone to appellant on the morning of February 21, 2019 was admitted into evidence during Detective Bailey's testimony. A text message from the complainant's cellular telephone, which appellant stated was sent to him at 2:31 a.m., said: "Anthony I know it's early and you have to wake up soon but please stop by on your way to work."

[27] Detective Bailey noted that this statement by appellant was contradicted by the email that Wilson sent to appellant about the complainant's motion to modify. Appellant received Wilson's email in the morning on February 21, 2019 and before he spoke with Bailey and Detective Hawkins. Hawkins testified that a printed copy of Wilson's email with a printed copy of the complainant's motion to modify was found by law enforcement officers in appellant's car. Hawkins also testified that the complainant's motion to modify stated that the complainant was seeking an "increase" in child support from appellant by "a lot."

front door of her home. Appellant stated that the complainant had three video surveillance cameras outside of her house, but the surveillance camera at the back of her house was not working.

Appellant confirmed that he went into the complainant's home on the morning of February 21, 2019 and took the child, but he stated that he did not speak to the complainant. Appellant told the law enforcement officers that he "drove all the way to work in Houston" and then "dr[o]ve back to Lake Jackson" to pick up the child and take him to daycare, before then "driv[ing] back to Houston to work." According to appellant, he had a flexible work schedule that allowed him to drop the child off at daycare and not be at work until 9:00 a.m.

While speaking with appellant on the night of February 21, 2019, Detective Bailey noted that appellant said that his parents were "going to be really freaked out" about the complainant's death, but appellant did not appear to be "freaked out" himself. Appellant did not show much emotion. Appellant also stated that "he didn't see any reason why anybody would want to attack [the complainant]," which Bailey found odd since he and Detective Hawkins had told appellant that the officers did not know yet whether the complainant had died from "a slip and fall or if she was murdered or if it was suicide."

Detective Bailey further testified that appellant gave inconsistent statements during his interview on February 21, 2019. And appellant made some odd

statements, such as: "My timeline should be very clear."[28]  Appellant told the law enforcement officers that he and the complainant were not in a relationship, and he was dating other women.  But, according to appellant, he and the complainant had dinner plans for February 22, 2019.

During Detective Bailey's testimony, the trial court admitted into evidence an audio recording of appellant's February 21, 2019 interview.  In that interview, appellant stated that the complainant's friend, Mikel, had contacted him earlier in the evening on February 21, 2019 because she had plans with the complainant, and appellant had told Mikel that he would try and call the complainant.  When appellant asked, during his interview, "what happened" to the complainant, Detective Hawkins told appellant that they "didn't know yet."  Hawkins then reiterated that the complainant had died, but he did not know "why or how" at that point.  Appellant told the officers that he did not see why anyone would "attack" the complainant.  Appellant described his house to the officers as a work in progress and stated that he was doing remodeling work on the home.[29]  He stated that his mother had been at his home earlier in the evening on February 21, 2019 helping him paint.

---

[28]  Detective Hawkins testified that "timeline" is "more a police term" and appellant was "trying to establish an alibi."  (Internal quotations omitted.)

[29]  Appellant also noted that he was "trying to run a mead business" at his house, which he had been working on for the past two years.

Detective Hawkins asked appellant, during the interview, about the last time he had spoken to the complainant, and appellant responded that the complainant had sent him a text message at 2:31 a.m. that morning, which was strange behavior. But according to appellant, he did not get the text message until he was at work in Houston at 5:19 a.m.

When appellant saw the text message, he contacted his work supervisor, Kevin Henson, and told him that the complainant's behavior was "abnormal" and he needed to go check that everything was okay with the child. Appellant then went to pick up the child from the complainant's house in Lake Jackson and took him to daycare. When he got to the complainant's house on the morning of February 21, 2019, around 6:45 a.m., the child had just woken up. The child had been sleeping in the primary bedroom, he was getting out of bed, and he was not dressed. The complainant was not in the primary bedroom, but appellant stated that it "sounded like" the complainant was taking a shower. Appellant did not see the complainant though, and the complainant did not say anything. After dropping off the child at daycare, appellant returned to work in Houston.

After appellant finished work, he picked the child up from daycare and brought the child to his house in Angleton. According to appellant, it was planned for the child to spend February 21, 2019 to February 24, 2019 with him, and it was always planned that appellant would take the child to daycare on the morning of

February 21, 2019.[30]  Yet appellant stressed how difficult the morning was for him because he was "all the way in Houston" at work and then he drove "all the way back" to Lake Jackson to pick up the child.  Appellant noted the complainant's failure to respond to his text messages on the morning of February 21, 2019 was abnormal behavior.

Appellant further told Detective Hawkins, during his interview, that he had a key to the complainant's house, but when he arrived at the complainant's home on February 21, 2019, the complainant's key was already in the front door, which appellant characterized as "normal for" the complainant.  Appellant also stated that there were three surveillance video cameras outside of the complainant's house.  Two of the surveillance video cameras worked, but the camera at the back of the house did not.

As to the complainant's and appellant's custody arrangement for the child, appellant stated during his interview that every year[31] he and the complainant went back to court to "re-do [their] temporary order[]" and they were in that "phase"

---

[30]  Appellant stated that he had previously taken the child to daycare when the complainant was traveling for work, and his "flexible schedule" at work allowed him to come to work at 9:00 a.m. on the days that he needed to take the child to daycare.  Taking the child to daycare on February 21, 2019 was "normal" according to appellant.

[31]  Detective Hawkins testified that law enforcement officers learned through their investigation that this was not something that happened "every year" between the complainant and appellant.  A date for the complainant and appellant to return to court related to the child was not set until February 20, 2019 when the complainant filed the motion to modify.

currently.[32]   Appellant described his relationship with the complainant as "co-parents" and stated that they were not intimate.[33]   But he also stated that they had planned to move into appellant's house in Angleton as a family, and they had planned to have dinner at appellant's house on February 22, 2019.   They had not been having any "marital issues," although appellant also told Detective Hawkins that there were other women in his life.

Further, appellant stated, during his interview, that the complainant was "emotional."   And appellant referred repeatedly to his "timeline," and he stated that his "timeline" should be clear as to when he was at the complainant's house that day, when he dropped the child off at daycare that day, and when he reported to work that day.

*Detective Hawkins*

Detective Hawkins testified that on February 21, 2019, at 5:50 p.m., he was called "for a death investigation" at 54 Greenvale Court.   Upon arrival, Hawkins noticed that the front door to the home had a key in the lock.   The key had a keychain attached to it that was shaped like a t-shirt.   Hawkins noted that there did

---

[32]   Appellant told Detective Hawkins, during his interview, that both he and the complainant "did not want child support."   And he and the complainant had set up a joint account for the child's needs.   He stated that he had not been "served" with "child support" papers, but he knew that the complainant had contacted her lawyer so that the temporary order could be "updated."   Appellant also stated that he knew the complainant had filed something.

[33]   Upon further discussions with appellant though, Detective Hawkins learned that appellant and the complainant had sexual intercourse in January 2019.

47

not appear to be any signs of a burglary having taken place in the home or that someone had been searching the home for valuables. There were no signs of forced entry into the home.

Detective Hawkins explained that after entering the house, he went to the primary bedroom and found a cellular telephone at the foot of the bed, which "seemed in an odd position." And according to Hawkins, law enforcement officers had found blood on the sheets and pillows in the bed, which indicated to Hawkins that "a harmful event occurred inside" the primary bedroom. There was also blood on the floor next to the bed. But there was no blood leading from the bed in the primary bedroom to the primary bathroom, which indicated that "the crime scene [had been] cleaned."

After Detective Hawkins entered the primary bathroom, he saw the complainant naked in the bathtub. The complainant had blood in her hair, and a wine bottle next to her.[34] "[R]igor mortis was fully set [in]," and the complainant had "[a] large wound on the left side of the top of her head." There was also a broken wine glass on the floor of the primary bathroom and on the countertop, which looked like it had "had been broken over the counter instead of dropped or something like that." Hawkins found the position of the wine glass to be suspicious. There were no signs of a struggle in the primary bathroom.

---

[34] Detective Hawkins noted that there were similar wine bottles "in the 'his' portion of the 'his and her' closets" in the primary bedroom.

Detective Hawkins also noted that there was no bathing towel near the bathtub, which made the scene look like "it wasn't an accident" because the complainant "wouldn't have been taking a bath on her own" without a towel. Law enforcement officers determined that the scene looked "staged." Cleaning products were found in the cabinet under the sink in the primary bathroom, and according to Hawkins, it looked like the primary bathroom had "been cleaned up."

Because the child was not found in the complainant's home, Detective Hawkins and Detective Bailey went to appellant's house to see if they could locate the child. They drove to appellant's house in Angleton at about 10:00 p.m. on February 21, 2019. Appellant's home was about fifteen minutes away from the complainant's home. When they arrived at appellant's home, Hawkins called appellant and stated that he needed to meet with appellant in person about something important. Hawkins was purposefully vague because he wanted to see "what [appellant] would say." But appellant did not ask Hawkins what the law enforcement officers wanted to see him about, which Hawkins found suspicious. Hawkins did not release specific information to appellant about the complainant's death for investigative reasons.

When appellant came out to the gate in front of his home, he invited Detective Hawkins and Detective Bailey into his house, and the officers saw the child sleeping inside. Appellant also voluntarily participated in an interview with

49

the law enforcement officers. At the beginning of appellant's interview, appellant brought up a text message from the complainant right away and "practically threw his cell[ular] [tele]phone at" Hawkins. This was unusual behavior in Hawkins's opinion. Appellant allowed Hawkins to photograph the text message sent from the complainant's cellular telephone to appellant on February 21, 2019. The text message was sent at 2:31 a.m. and stated: "Anthony I know it's early and you have to wake up soon but please stop by on your way to work."[35] (Internal quotations omitted.) In response, appellant sent the complainant the following text message: "Trisha I just sat down at my desk...What's on your mind?" (Internal quotations omitted.) But there was no response sent from the complainant's cellular telephone. Appellant then sent the complainant another text message saying: "Is [the child] dressed? I'm about to pull up." (Internal quotations omitted.) The complainant's cellular telephone again sent no response. Finally, appellant sent the complainant a text message stating: "Just dropped off at [d]aycare. He was in fine spirits. I have to get back to work so we'll have to talk later. I meet with the lawyer this evening. Plan to have my parents over later to visit. Unless you have changed your mind I was still planning dinner for us at my place Friday."[36]

---

[35] Detective Hawkins noted that in this text message sent from the complainant's cellular telephone, the word "you" is spelled out correctly as "Y-O-U" and the word "your" is spelled out correctly as "Y-O-U-R." (Internal quotations omitted.)

[36] During Detective Hawkins testimony, copies of additional text messages between the complainant and appellant from January 2019 were admitted into evidence. In

(Internal quotations omitted.) Hawkins testified that the text message from the complainant's cellular telephone to appellant at 2:31 a.m. on February 21, 2010 was not "consistent" with the complainant's regular text message pattern because it did not include the letter "u" in place of the word "you." (Internal quotations omitted.) However, the text message from the complainant's cellular telephone was consistent with the way that appellant wrote his text messages in which he used the whole word "you" and did not abbreviate the word with a single letter. (Internal quotations omitted.)

Detective Hawkins further testified that he called appellant on February 22, 2019 and told appellant that the complainant's death "looked like it was murder." But he did not tell appellant about the condition of the complainant's body or that the complainant was found in the bathtub in the primary bathroom in her home.

On February 25, 2019, Detective Hawkins interviewed appellant again at appellant's home. An audio recording of appellant's interview with Hawkins was admitted into evidence. During his interview, appellant told Hawkins that he was at the complainant's house on the night of February 19, 2019.[37] He had dinner at

---

those text messages from appellant to the complainant, he spells the word "you" "Y-O-U," but in her text messages to appellant, the complainant spells the word "you" with just the letter "u."

[37] Detective Hawkins testified that law enforcement officers found a receipt from "Wild West BBQ in Angleton" dated February 19, 2019, with a timestamp of 6:32 p.m. Hawkins testified that the receipt was significant because appellant had

the complainant's house on that night.[38]  On February 20, 2019, the complainant had dinner plans with Yolanda.  He did not see the complainant on February 20, 2019.

As to the morning of February 21, 2019, appellant again stated that he went to work before he went to pick up the child to take him to daycare.  Appellant emailed Henson at work, and he called Henson.  He told Henson that he would be coming back to work.  According to appellant, it was normal for him to go to work around 5:00 a.m.  Appellant noted that when he was at the complainant's house on the morning of February 21, 2019, he thought the complainant was taking a shower and the primary bathroom door was closed.

Appellant, during his interview, also told Detective Hawkins that he knew that it was normal for law enforcement officers to think that the "spouse" "did it." And he stated that he went to work on February 25, 2019.  Hawkins told appellant that there was "no way" that the complainant's death was "an accident."

Detective Hawkins testified that Texas Ranger Norsworthy interviewed appellant on February 27, 2019.[39]  While listening to appellant's interview with

---

told Hawkins that he had dinner with the complainant at her home that night, but the receipt showed "dinner for one person in Angleton."

[38]  Appellant also stated that if he did not have dinner at the complainant's house on February 19, 2019, then she had dinner at his house that night.

[39]  A videotape recording of Texas Ranger Norsworthy's interview with appellant on February 27, 2019 was admitted into evidence.

Norsworthy at trial, Hawkins noted that appellant lied during his interview with Norsworthy about what he had done on February 25, 2019 and appellant lied that there had not been a significant change in his relationship with the complainant before the complainant's death.[40]   And although appellant stated in his interview that he felt "rattled," Hawkins noted that appellant never appeared "rattled" during the times that he saw appellant on February 21, 2019, February 25, 2019, and February 27, 2019.  According to Hawkins, appellant made inconsistent statements in his February 27, 2019 interview.

Detective Hawkins further testified that during the interview with Texas Ranger Norsworthy, appellant stated that the complainant's "pay scale [was] slightly higher than his," but through his investigation Hawkins learned that the complainant's "pay scale" was "significantly higher" than appellant's.  Although appellant tried to make it seem like he and the complainant were making similar salaries, the law enforcement officers' investigation revealed that they were not.

Additionally, Detective Hawkins noted that appellant, during his interview, stated that the first time that he and the complainant were supposed to return to court about their temporary order related to the child, appellant decided to move in

---

[40]   Detective Hawkins noted that on February 21, 2019, appellant sent his mother, Rosemarie Adell, a text message stating that he and the complainant had "split up" after the child's birthday in February 2019.  (Internal quotations omitted.) Hawkins also testified that appellant lied, during his interview, about having had dinner with the complainant on February 19, 2019.

with the complainant. And appellant told Texas Ranger Norsworthy during his interview that although he saw the complainant's key in the front door of her home on February 21, 2019 when he went to pick up the child, he did nothing about it and left it in the front door. Of particular importance to Hawkins, appellant, when discussing his actions on the morning of February 21, 2019, stated that after going to work, he went "*back to*" the complainant's house to "see how things were going." (Emphasis added.)

Detective Hawkins further testified about his continuing investigation of the complainant's death. Through the investigation, he learned that the complainant left work at 4:46 p.m. on February 20, 2019, and she picked up the child from daycare at 4:52 p.m. The complainant's last communication before her death was a work email that she sent on February 20, 2019 at 9:25 p.m.

According to Detective Hawkins, an analysis of appellant's cellular telephone showed that appellant received an incoming text message from the complainant's cellular telephone at 2:31 a.m. on February 21, 2019. Appellant then sent the complainant a text message at 5:19 a.m., stating: "Trisha I just sat down at my desk...What's on your mind?" Appellant next called Kenneth Haught, a co-worker, at 5:36 a.m., for about one minute. At 6:16 a.m., appellant received a text message from Kevin Henson, stating that he had seen appellant's email and to keep him updated. At 6:43 a.m., appellant sent the complainant a text message

54

asking if the child was dressed and stating that he was "about to pull up." (Internal quotations omitted.) Appellant did not call the complainant. At 6:45 a.m., appellant called Henson, and at 7:19 a.m., appellant sent the complainant a text message telling her that he had dropped the child off at daycare and that he was going to meet with his attorney that night.[41] Hawkins further testified that appellant had multiple communications with his mother, Rosemarie, on February 21, 2019. In his text messages with Rosemarie, appellant told her that he had received a letter from his attorney and that the complainant "wishe[d] to increase the funds that [he] put forth for the child" so his previous discussion with Rosemarie on the night of February 20, 2019 had been "accurate." Appellant noted that it was the complainant's decision to "get lawyers" involved in his and the complainant's relationship. (Internal quotations omitted.) Rosemarie also mentioned to appellant about getting a roommate to help with his "monthly bills to hang on to [his] house." Although appellant made multiple telephone calls during the day on February 21, 2019, he did not call the complainant once.

At 4:45 p.m. on February 21, 2019, appellant called "Waste Connections" from his cellular telephone. And around 5:00 p.m. on February 21, 2019, appellant took several photographs of the child and himself at his house on his cellular

---

[41] This indicated to Detective Hawkins that appellant had made plans to meet his attorney before the morning of February 21, 2019, meaning appellant was aware of the motion to modify at the time of the complainant's death.

telephone. At 5:48 p.m., appellant received a text message from Mikel about the complainant's whereabouts. Appellant responded to Mikel's text message at 8:01 p.m. Appellant told Mikel that he would call the complainant "after dinner." (Internal quotations omitted.) But appellant never made a telephone call to the complainant that night. Detective Hawkins opined that this was because appellant already knew that the complainant was dead.

Detective Hawkins also testified that following the complainant's death, appellant purchased a new cellular telephone. When law enforcement officers examined the new cellular telephone, they found artwork depicting a nude female in a bathtub.

As to the complainant's finances, Detective Hawkins testified that the complainant's salary at Dow Chemical was $12,452 a month or about $150,000 a year. As to appellant's finances, Hawkins explained appellant made about $7,850 a month. Appellant's salary was "about 60 percent of what [the complainant] made."

When appellant purchased his home in Angleton in November 2018, his loan amount was $244,000 and his monthly mortgage payment was $2,329.52. Appellant's credit card bill from February 6, 2019 showed that he had a balance due of $7,314, and he was "over his credit limit by" $514.98. At the time of the complainant's death, appellant was past due on his car payments.

As to the joint account that appellant and the complainant had set up for the child, Detective Hawkins testified that the account was opened on April 28, 2017. On December 11, 2018, appellant "took out a loan advance" on the child's account in the amount of $15,000, and he took that $15,000 out of the child's account in December 2018. On March 5, 2019, appellant took an additional $6,500 out of the child's account, which was money that had previously been put into the account in addition to the $15,000 loan advance that appellant had received. Thus, between December 2018 and March 5, 2019, appellant took $21,500 out of the child's account.

Detective Hawkins testified that "income disparity and being forced to pay child support" could "anger a person." And child support would be a financial strain on appellant. When asked if appellant had "a lot of debt," Hawkins replied: "Yes."

During his testimony Detective Hawkins viewed videotape recordings from the surveillance video cameras at the complainant's house.[42] The videotape recording from February 11, 2019, when appellant still lived at the complainant's house, showed appellant walking up to the front door of the home, with a large set

---

[42] Texas Ranger Norsworthy testified that law enforcement officers were able to obtain surveillance videotape recordings from the two surveillance video cameras located on the front side of the complainant's home. There were no surveillance videotape recordings from the surveillance video camera at the back of the complainant's house.

57

of keys in his hand, and opening the door with his keys. The videotape recording from February 16, 2019, after appellant had moved out of the complainant's home, showed appellant walking up to the front door of the home and waiting to be let into the home; he knocked on the door and did not walk straight inside. The videotape recording from February 17, 2019, when appellant no longer lived at the complainant's house, also showed appellant waiting at the front door of the home to be let inside. And the videotape recording from February 18, 2019 showed appellant waiting at the front door of the complainant's home to be let inside. Hawkins testified that on February 16, 17, and 18, 2019, appellant did not approach the complainant's home holding his keys in his hand, and he stopped at the front door each time.

Notably, the videotape recordings from February 21, 2019—the day of the complainant's death—showed appellant arriving at the complainant's home at 6:45 a.m., and appellant approached the front door of the home holding a set of keys. According to Detective Hawkins, the videotape recordings from that day showed appellant taking the keys out of his pocket as soon as he got out of his SUV. The keys in appellant's hand were not the same large set of keys that appellant had used to open the complainant's front door on February 11, 2019. The videotape recordings from February 21, 2019 also showed appellant leaving

58

the complainant's home carrying the child,[43] but appellant did not have any keys in his hand when he left the complainant's home. Hawkins noted that appellant's behavior when he arrived at the complainant's home on February 21, 2019—the day of the complainant's death—was much different than when he approached the complainant's home on February 16, 17, or 18, 2019, when the complainant was alive. And, according to Hawkins, the keys that were found in the complainant's front door when Yolanda and others arrived at the complainant's home later in the day were the same ones that were in appellant's hand on the morning of February 21, 2019.

In conclusion, Detective Hawkins opined that the person who killed the complainant had to have been "intimately familiar" with her. He had to have known how to get in the complainant's house and which of the surveillance video cameras at the complainant's house did not work. He also had to have known that the complainant loved wine. Hawkins added that, during the investigation of the complainant's death, appellant never expressed a desire of "finding [her] true killer."

---

[43] Texas Ranger Norsworthy testified that appellant can be seen on the surveillance videotape recordings from February 21, 2019 leaving the complainant's house about fifteen minutes after he initially arrived.

59

*Texas Ranger Norsworthy*

Texas Ranger Norsworthy testified that he interviewed appellant on February 27, 2019. Norsworthy noted that during appellant's interview, he was emotionless, monotone in his speech, and robotic in his actions. Norsworthy also observed that although the interview focused on the death of the complainant—the mother of appellant's child—appellant "lacked empathy in her death."[44]

Texas Ranger Norsworthy described appellant as self-centered. Instead of having an emotional reaction to the news of the complainant's death, appellant focused on "what he was going to have to do as a single father and how he was going to have to deal with [the child] when he had to go to work." When appellant described "problems around the[] relationship" with the complainant, they were the complainant's "issues." And appellant was very honest about his "polygamist lifestyle."

Texas Ranger Norsworthy also observed that during appellant's interview, if Norsworthy was "talking about [appellant] and something that would benefit him," appellant was "extremely open and g[ave] a very good, honest, elaborate answer." But if Norsworthy was "talking about the events leading up to [the complainant's] murder," then appellant was "intentionally vague" and "skirt[ed] the issue."

---

[44] Texas Ranger Norsworthy also described appellant has having "essentially no emotion and no empathy for others."

Further, Texas Ranger Norsworthy noted that appellant would "often double-talk" and was "all over the board with his speech and his stories and his life history." Appellant also "downplay[ed] the judicial proceedings" related to the complainant's motion to modify that were set to occur, saying that it was "no big deal" and "a preplanned event that happen[ed] annually." At the same time though, appellant described the complainant as "so emotional" about the child custody and child support issues. And appellant complained that law enforcement officers had not told him anything about what had happened to the complainant.

According to Texas Ranger Norsworthy, in discussing the events of February 21, 2019, appellant, during his interview, told "an unbelievable story" about how he "essentially st[ole] [the child] from the [complainant's] house without any direct communication with [the complainant]." And appellant was very evasive about his whereabouts on February 20, 2019, which Norsworthy found to be odd because appellant's movements on February 20, 2019 were "very explainable." There was no evidence that appellant had been at the complainant's home on February 20, 2019.

Texas Ranger Norsworthy also testified that appellant had accessed the surveillance video camera system from the complainant's house on the morning of

February 21, 2019, but he did not delete any surveillance videotape recordings.[45]

Appellant knew that the surveillance video camera at the back of the complainant's home was not working, and he said so "multiple times" in his interview. Based on the printed copy of an email found in appellant's car, Norsworthy believed that appellant had spoken to his attorney on February 20, 2019 about the complainant's motion to modify.

*Medical Examiner*

Dr. Satish Chundru, a medical examiner, testified that he performed the autopsy on the complainant's body.[46] The complainant was thirty-nine years old at the time of her death. An external examination of the complainant's body showed that she had a large laceration on the left side of her scalp. Her left eye was swollen and discolored, and there was an abrasion or contusion on her left facial cheek. Dr. Chundru described the laceration on the left side of the complainant's scalp as "a pretty extensive injury." The complainant also had bruising on the right side of her scalp and a "fresh" bruise on her hand. (Internal quotations omitted.)

---

[45]     Detective Hawkins noted that during appellant's interview with Texas Ranger Norsworthy, appellant stated that he "rarely check[ed]" the surveillance video camera system from the complainant's home, but he did so on the morning of February 21, 2019. According to Hawkins, looking at the surveillance video camera system was consistent with "making sure there's not something on there [that] you don't want found."

[46]     A copy of Dr. Chundru's autopsy report was admitted into evidence.

Underneath the complainant's head laceration, Dr. Chundru found multiple skull fractures. If the complainant had fallen, there would have been a single skull fracture—not multiple ones like Dr. Chundru found. The multiple skull fractures found on the complainant would have resulted from being hit "with, like, a hammer or something like that." Multiple fractures did not result from a simple fall. Either the complainant's head had hit an object multiple times or an object had hit the complainant's head multiple times. Dr. Chundru opined that multiple "blow[s]" to the complainant's head produced the fractures. The fractures likely caused the complainant's eye-bruising because blood would have seeped into her eyelids as a result of the fractures.

Dr. Chundru also discovered a hemorrhage around and within the complainant's brain, and the complainant had bruising of the brain. Hemorrhages in or around the brain and bruising on the brain were signs of "pretty severe trauma." According to Dr. Chundru, the complainant had a subarachnoid hemorrhage, meaning that blood was directly touching the complainant's brain tissue and irritating the brain. This could cause a person to die because the irritation would have caused the heart and lungs to stop functioning. The complainant also had a subdural hemorrhage, which could lead to death because "when it gets so big . . . it pushes on the brain." The bruising on the complainant's brain would also have irritated her brain.

63

Dr. Chundru further testified that a toxicology report for the complainant revealed that she did not have any alcohol or narcotics in her system. She only tested positive for caffeine and cough medicine.

According to Dr. Chundru, the complainant's cause of death was blunt force head injuries. The complainant's injuries were not the result of a "slip and fall." A number of different objects could have caused the blunt force injuries to the complainant's head, including the wine bottle found near the complainant in the primary bathroom. The object just needed to be blunt and hard. Either the complainant's injuries were caused by the object striking the complainant's head repeatedly or the complainant's head striking the object repeatedly. In sum, Dr. Chundru explained that blunt force was used on the left side of the complainant's skull, which caused multiple fractures and bleeding in her brain and resulted in the complainant's death. The blunt force used could have caused serious bodily injury and death. And the manner of the complainant's death was homicide. The complainant did not die of natural causes.

### Appellant's Work History

Todd Gentile testified that he worked at LyondellBasell as an operations supervisor, and he previously supervised appellant at work from May 2016 until June 2018. Appellant was employed as a maintenance instrument and electrical engineer at LyondellBasell. According to Gentile, appellant had issues with

attendance at work. The workday was supposed to start at 6:30 a.m. and end at 3:00 p.m., and appellant was supposed to be at work by 6:30 a.m. Eventually, because of appellant's attendance issues, a modified schedule or a flexible schedule was developed for him, which allowed appellant to come to work at 6:00 a.m., and he would "be on the clock if he got in[to] [work] by" that time. Appellant would not be considered "late" until 6:30 a.m. After the modified schedule was created for appellant, he did not have attendance issues at work. In 2018, Henson took over as appellant's supervisor.

Henson testified that he worked at LyondellBasell as "the maintenance team lead." Henson became the "team lead" in May 2018 and that role involved supervising appellant at work. Appellant was paid hourly and was likely paid between $35 and $45 per hour. The standard work hours for maintenance team employees, including appellant, was from 6:30 a.m. to 3:00 p.m. However, appellant was allowed to start work anytime between 6:00 a.m. and 6:30 a.m. because he had a long drive to work and needed some flexibility on when he could arrive. But, if appellant needed to come into work later than 6:30 a.m., he had to communicate with Henson ahead of time, and they would discuss what appellant's modified hours would be.

Henson further testified that he knew that appellant had a child, and the child's mother usually took the child to daycare. But when the child's mother was

traveling for work, it was appellant's responsibility to take the child to daycare in the morning. When those times occurred, appellant would request that his work hours be modified so that he would start work at 8:00 a.m. and leave work at 4:00 p.m. Appellant would speak to Henson in advance about the need for modified work hours because he had to take the child to daycare. It was a "planned" change, and Henson would approve the request before the fact.

According to Henson, on February 21, 2019, appellant called Henson while Henson was driving to work. Appellant told Henson that "he would be late because he had to take [the child] to daycare." But appellant did not tell Henson that he had already been at work that morning or that he had sent Henson an email at 5:27 a.m.[47] Appellant had never called Henson while Henson was on the way to work to tell him that he needed to take the child to daycare. Appellant had always told Henson ahead of time the days that he would need to take the child to daycare, and Henson would approve it. But appellant did not let Henson know in advance that appellant would need a modified schedule on February 21, 2019. Henson saw appellant at work on February 21, 2019 around 9:15 a.m. or 9:30 a.m.

When Henson and appellant talked at work about the reason appellant was not there at his normal time, appellant told Henson that he and "the mother of [the

---

[47] The trial court admitted into evidence a copy of an email from appellant to Henson on February 21, 2019. The email was sent at 5:27 a.m. and stated: "Kevin, I need [to] take care of some family business this morning. I'll try to be back in the office before lunch. Please call me when you get this message."

child] were going through custody or child support issues at that time." Appellant told him that such conversations about child support happened once a year. Appellant called Henson around 11:00 p.m. on February 21, 2019 and told him that he needed to take February 22, 2019 off work "in regard[] to what [they] had discussed earlier" in the day.

Henson next saw appellant at work on February 25, 2019, and appellant spoke about "the reason he needed to stay home" on February 22, 2019. Appellant told Henson that the complainant "had been killed and that he was talking with law enforcement . . . about all that." Appellant told Henson that the complainant was found in the bathtub.

During Henson's testimony, "badge records" from LyondellBasell were admitted into evidence. Those records show that appellant arrived at work at 5:03 a.m. on February 21, 2019 and left work at 5:36 a.m.[48] Appellant returned to work at 8:57 a.m. and left again at 11:36 a.m. Appellant then returned to work at 12:07 p.m. and left work for the day at 3:09 p.m. On February 25, 2019, appellant arrived to work at 8:36 a.m. and left work at 2:22 p.m.

Kenneth Haught testified that he worked at LyondellBasell as a maintenance technician, and he had worked with appellant since 2014 on the maintenance team. In 2016, appellant was in a relationship with the complainant "off and on." In

---

[48]     Henson testified that this meant that appellant was at work for less than thirty-three minutes on the morning of February 21, 2019.

2017, appellant and the complainant had the child. Appellant told Haught that he and the complainant had an "agreement" about "some kind of account set up for [appellant] to be able to put money in for" the child. At some point, appellant bought a house in Angleton. According to Haught, the property was "huge" and "[a] lot of work needed to be done" on the house.

On February 21, 2019, Haught and another co-worker called appellant in the morning, and appellant "said something was going on and he didn't want to talk about it." Haught later learned about the complainant's death on the internet, but he never told appellant that he knew that the complainant had died.

At the beginning of March, when appellant returned to work following the complainant's death, appellant never mentioned the complainant's death to Haught. Appellant spoke to Haught about "marrying" the complainant after Haught already knew that she had died. Haught found it odd that appellant never mentioned the complainant's death to him because Haught knew the complainant and Haught had worked closely with appellant.

Haught noted that he had seen appellant "get mad and inappropriately lose his temper." But he had never seen appellant "physically threaten anybody." Appellant liked things to be done his way. And he would manipulate situations so that they would be in his favor.

68

*Daycare Employees*

Arlene Hernandez testified that she worked at Kool Kidz daycare, where she is an owner and the cook. The daycare was in Lake Jackson near the Dow Chemical office. Hernandez met the complainant when the complainant was pregnant with the child because the complainant came to tour the facility. Appellant was the father of the child.

After the child was born, he started attending the daycare when he was six or seven weeks old because the complainant went back to work. While the child was an infant, the complainant would come to the daycare every day during her lunch break to breastfeed the child. When the child got old enough to eat regular food, the complainant would send him with meat, potatoes, carrots, or cabbage, fruit, and homemade muffins for lunch. The child's lunch would have a glass container with a red lid for the meat and vegetables and a separate container for the fruit. The complainant would send the child with one muffin. The child's lunch was packaged the same way every day. The complainant also sent the child to school with milk that she would buy from a dairy farm. The daycare employees were not allowed to provide the child with the daycare's milk. The complainant would put the child's lunch in the refrigerator at the daycare when she dropped the child off or she would bring it to Hernandez. The child did not have a lunchbox or lunch

bag. If the complainant was going to let the child eat the "school lunch" at the daycare, she would tell Hernandez ahead of time.

According to Hernandez, if the complainant was not traveling for work, then she would always bring the child to daycare in the morning and pick him up in the afternoon. And if the complainant was traveling for work, she would tell the daycare employees who would be dropping the child off and picking the child up. If the complainant was not going to be the person dropping the child off or picking the child up, she would always let the daycare employees know. If the child was not going to come to daycare one day, the complainant would tell the daycare employees in advance. If the complainant was going to deviate from the normal drop-off or pick-up schedule or the child's normal meal format, she would "[a]lways" let someone at the daycare know.

Hernandez testified that on February 21, 2019, she arrived at the daycare at about 5:45 a.m. At 7:00 a.m., the daycare feeds the children breakfast. Normally, the child arrived at the daycare between 7:30 a.m. and 7:45 a.m., or 8:00 a.m. On February 21, 2019, the child was at the daycare early enough to eat breakfast, which Hernandez found to be odd because he had never eaten breakfast at the daycare before that day. Hernandez noted that even in the past when the complainant was traveling and appellant was responsible for dropping the child off at daycare, appellant still fed the child breakfast before he arrived at the daycare.

70

Hernandez later learned that appellant had dropped the child off on the morning of February 21, 2019. The complainant had never spoken to Hernandez about appellant dropping the child off on February 21, 2019.

Hernandez further testified that when she went to look for the child's food at lunchtime on February 21, 2019, she could not find it in the refrigerator. Hernandez could not find it because the child's food had been brought in a lunch bag, and the child had never brought a lunch bag before. Inside the lunch bag, was a plastic bowl, three muffins in a baggie, and no fruit. The child's lunch had never been packaged that way. Meat and potatoes were in the plastic bowl, but they were "all on top of each other," which was not the normal way that the complainant packed the child's lunch. Hernandez had never seen the complainant "package three muffins in a baggie for" the child either. The lunch bag also contained a plastic sippy cup, which the complainant had never used for the child before. Previously, when the complainant had been out of town for work, appellant had brought the child's lunch to the daycare in the same glass containers that the complainant used.

Jessica DeLaGarza testified that she worked at Kool Kidz daycare and was one of the owners. DeLaGarza explained that she met the complainant while the complainant was pregnant with the child. The complainant worked at Dow Chemical, and the daycare was about one minute away from the Dow Chemical

71

office. The child started attending daycare when the complainant went back to work after his birth.

DeLaGarza explained that the child was not allowed to eat the lunches provided by the daycare, and the complainant would bring the child's lunch and milk to daycare daily. DeLaGarza did not get to the daycare until after 8:00 a.m., but she stayed through pickup in the afternoon. The complainant was almost always the person who picked the child up from daycare in the afternoon. Occasionally, appellant or the complainant's mother would pick the child up from daycare. When appellant was the person responsible for picking up the child, the complainant would send text messages to DeLaGarza to ask if the child had "left yet or been picked up yet."

DeLaGarza testified that the complainant was "a perfect mother" and the child was her top priority. The complainant "gave up her lunch breaks to be with him." She was particular about everything the daycare did with the child, and she was "a very good mom." Occasionally, the child would not attend the daycare on a Friday because the complainant and Yolanda spent the day with the child.

When the complainant traveled for work, appellant would be responsible for picking up the child from daycare. The complainant notified DeLaGarza when she would be traveling for work. The complainant would call DeLaGarza's cellular telephone to let her know if someone else was dropping off or picking up the child.

The complainant always informed DeLaGarza if someone other than the complainant was dropping the child off at daycare or picking him up from daycare; this happened "[e]very time."

DeLaGarza further testified that when the child first began attending daycare, the complainant paid for the childcare costs. Several months later, appellant started making cash payments, but his cash payments were not made consistently and were never a consistent amount of money.

On February 20, 2019, the complainant picked the child up from daycare. The complainant and DeLaGarza talked for about twenty minutes that day. During their conversation, the complainant did not tell DeLaGarza that appellant would be dropping the child off at daycare the next day, February 21, 2019. That evening DeLaGarza did not receive any telephone calls or text messages from the complainant letting DeLaGarza know that appellant would be dropping the child off at daycare on February 21, 2019.

On February 21, 2019, other daycare employees asked DeLaGarza if she had been told that appellant, rather than the complainant, was going to drop off the child that morning, and DeLaGarza stated it was out of the ordinary for no one at the daycare to have been told ahead of time that appellant would be doing the drop off. DeLaGarza also noted that the child's lunch was packaged oddly that day,

which was weird because the complainant was consistent on the things that she brought for the child's lunch and the way they were packaged.

The week following the complainant's death, DeLaGarza saw appellant. He wanted to talk about bringing the child back to the daycare, and he wanted to remove the complainant's family members from the list of persons who were authorized to pick up the child from daycare. Appellant added his sister to the list of persons authorized to drop off and pick up the child from the daycare, and he stated that he would be the person "picking up or dropping off" the child. Appellant did not express any concern over the complainant's death.

When DeLaGarza asked how the child was doing after the complainant's death, appellant stated that he was "happy" and "his self" and he "didn't notice a difference." Appellant also told DeLaGarza that the child would be "[f]ine without his mother." Later, DeLaGarza offered to go get milk for the child from the dairy farm that the complainant bought her milk from so that the child could continue drinking the same milk, but appellant did not accept that offer.

DeLaGarza also testified that the last time that the complainant traveled for work "[s]hortly before her passing," DeLaGarza asked appellant: "Aren't you so excited [the complainant] is returning tomorrow[?]" (Internal quotations omitted.) And appellant said: "No, it's so much easier without her here." (Internal quotations omitted.)

74

Gisela Garcia testified that she previously worked at Kool Kidz as a teacher. Normally, the complainant would drop off and pick up the child from daycare. When the complainant was out of town, she would always tell the daycare employees that appellant would be dropping off and picking up the child. If the complainant was not going to be dropping off or picking up the child the next day, she would tell the daycare the day before.

On February 20, 2019, Garcia saw the complainant when she picked up the child. The complainant did not tell Garcia that appellant would be dropping off or picking up the child the next day. As of February 20, 2019, Garcia believed that the complainant would be dropping off the child the next morning.

Garcia stated that she worked on February 21, 2019, and she got to work about 7:00 a.m. When she arrived at work, she saw appellant there with the child. The child arrived at school at 7:07 a.m., which was early for him. Garcia was surprised by this because the complainant did not tell anyone at the daycare that appellant would be dropping the child off that day. At drop off, Garcia was given the child's lunch in a lunchbox that she had never seen before. Appellant told Garcia that he would be back in the afternoon to pick up the child.

*Appellant's Relationships*[49]

Patricia Davis testified that she dated appellant in high school and they dated "off and on" after high school. At some point, Davis learned that appellant was going to "have a child with someone," but appellant told her that he and that person had just "agreed to have a child"; "they weren't actually involved in a relationship."

Around February 2019, Davis's relationship with appellant "started again," and they had sexual intercourse. Appellant did not tell Davis that he was involved in another relationship at that time. On the night of February 19, 2019, appellant came to Davis's home, and they had sexual intercourse. On February 20, 2019, Davis and appellant sent messages to each other through Facebook Messenger.[50] Appellant told Davis that he went to visit his parents that night. At 10:12 p.m. on February 20, 2019, appellant sent Davis a message stating: "Well I'm about to begin the first coat in the master bath. It's the largest bath so let me put this coat on and see what time it is. Maybe you'll still be awake." (Internal quotations

---

[49] Additional women testified at trial about their relationships with appellant between 2016 and 2019.

[50] *See Edwards v. State*, 497 S.W.3d 147, 155 n.8 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) ("Facebook Messenger is a mobile tool that allows users to instantly send chat messages to friends on Facebook. Messages are received on [users'] mobile phones." (internal quotations omitted)); *see also Hassan v. Facebook, Inc.*, No. 19-cv-01003-JST, 2019 WL 3302721, at *1 (N.D. Cal. July 23, 2019) (order) (noting plaintiff used Facebook Messenger application to communicate with others via calls and instant messages).

76

omitted.)  At 10:14 p.m., appellant said that he was "[a]bout to start" and he would "let [Davis] know how it [went]."  (Internal quotations omitted.)  Appellant also mentioned maybe being able to see Davis later that night.

Davis testified that she did not see appellant on the night of February 20, 2019, and she went to sleep.  At 3:18 a.m. on February 21, 2019, appellant sent Davis a message saying: "Good morning."  (Internal quotations omitted.)  And at 3:48 a.m., appellant sent Davis another message that said: "Did you fall asleep on me[?]"  (Internal quotations omitted.)  At 3:49 a.m., appellant tried to call Davis. Appellant then sent Davis another message at 3:50 a.m., asking: "Is your door unlocked?  I was hoping to stop by for awhile on my way to work."  (Internal quotations omitted.)  Davis noted that her dog never alerted her that morning that appellant stopped by her house.

At 6:00 a.m., Davis responded to appellant's messages and told him that she had fallen asleep.  When Davis asked appellant if he had "been up all night," appellant responded: "2 maybe 3 hours. I've been trying to work till midnight and usually get up before my 4 am alarm."  (Internal quotations omitted.)  At 6:37 a.m., appellant told Davis that he would be "at work" soon.

Davis further testified that after the complainant's death, she spoke to appellant through Facebook Messenger on March 2, 2019.  When she asked appellant if law enforcement officers had "found out the cause of [the

complainant's] death," appellant stated that he "d[id] not believe so" and that law enforcement officers had not "given [him] much details." (Internal quotations omitted.) On March 11, 2019, appellant, in a conversation with Davis over Facebook Messenger, told her that law enforcement officers would not "even tell [him] what happened" and they would not "talk to [him] about the facts." (Internal quotations omitted.)

As to appellant generally, Davis stated that she would not characterize him as loyal or faithful. Appellant never tried to physically harm her.

Yulenty Deal testified that she worked at LyondellBasell and she met appellant at work. In 2018, Deal, who was married at the time, was in a relationship with appellant, and it was her understanding that appellant was not in a relationship with the complainant at that time. While they were together, appellant and Deal would go to hotels to have sexual intercourse after work.

Deal saw appellant at work on February 25, 2019, after the complainant's death. Appellant came to speak with her in her laboratory. He "looked a mess." Appellant told Deal "what happened" to the complainant. He said that the complainant was found in her house and in the bathroom and that law enforcement officers had given him that information.[51] Appellant stated that he did not know

---

[51] Detective Hawkins testified that he did not give appellant any details about the complainant's death on February 21, 2019, and when Hawkins spoke to appellant on February 22, 2019, he only told appellant that it looked like the complainant

what had caused the complainant's death. Later that day, Deal had sexual intercourse with appellant at a hotel in Channelview, Texas. Deal ended her relationship with appellant in 2020.

*Appellant*

Appellant testified that on February 20, 2019, he set his alarm for 4:30 a.m. or 5:00 a.m. to get up for work, and he got to work about 6:00 a.m. and left work about 4:00 p.m. that day. While at work on February 20, 2019, he received a telephone call from Wilson, who worked for appellant's attorney, and she told him that a motion to modify had been filed by the complainant. Appellant knew then that the complainant "wanted more child support" and that the complainant was seeking "[f]inancial support."

Appellant further testified that after work on February 20, 2019, he got a haircut. At some point, he went to visit his mother, Rosemarie, at her house and then went home. No one was at appellant's house with him on the night of February 20, 2019, and appellant stated that no one could "verify" that he was at his home "all night." Appellant started painting inside his house around 10:15 p.m. on February 20, 2019, and he estimated that he painted for two or three hours. Appellant also testified that he slept three or four hours on the night of

had been murdered, but he did not provide appellant with any further details. Hawkins did not call appellant anytime before appellant spoke to Deal on February 25, 2019 and give him details about the complainant's death.

79

February 20, 2019 and into the morning on February 21, 2019, after he finished painting. And he woke up about 3:00 a.m. on February 21, 2019. After waking up, appellant "tr[ied] to see" Davis, and he went to her house that morning. He tried to wake her up by sending her messages, but he did not go to the door of Davis's home. When asked what he was doing at 2:31 a.m., when a text message was sent from the complainant's cellular telephone, appellant stated: "Probably sleeping." Appellant arrived at work around 5:00 a.m. on February 21, 2019, which he admitted was "unusual" and "abnormal" for him. Because he had gone to Davis's home earlier that morning and could not wake her up, he stated that his choices were to either "[g]o back home or go to work," so he went to work an hour early. It took appellant an hour to drive to work, and he did not have preapproval to come into work that early. Appellant did not see the text message from the complainant's cellular telephone until he was at work.

Appellant further testified that he then left work, after only being there for a few minutes, and he drove an hour to pick up the child and take him to daycare. Appellant made no telephone calls to the complainant that morning after seeing the text message from her cellular telephone. Appellant agreed that he should have called the complainant that morning.

After appellant picked up the child from the complainant's house, he dropped him off at daycare and went back to work. Appellant testified that he

80

dropped the child off at daycare about forty minutes earlier than the time the child was normally dropped off. After work, appellant picked the child up from daycare and went to his house. He then called "Waste Connections" to come by his home and pick up trash. Appellant stated he was surprised when law enforcement officers showed up at his house around 10:00 p.m. that night.

When appellant returned to work on February 25, 2019, he told Henson that the complainant had died, and when Henson asked appellant for details, appellant stated that the complainant had been "found in her bathtub." Appellant acknowledged that law enforcement officers had not previously told him how the complainant had died or "where she was located," but he said that the fact that the complainant had been found in the bathtub "had been released to the public." Appellant stated that his family had told him about the bathtub because "of what was being posted on Facebook."[52]

---

[52]          Facebook, Inc. is an online social media and social networking service company. In general, the Facebook service can be accessed from devices with Internet connectivity, such as personal computers, tablets[,] and smartphones. After registering, users can create a customized profile [page] revealing information about themselves. Users can post text, photos and multimedia of their own devising and share it with other users as friends[.]

*Jeansonne v. State*, 624 S.W.3d 78, 90 n.13 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (alterations in original); *see also Woodhouse v. United States Gov't*, No. 2:21-cv-06372-SB, 2021 WL 6333468, at *8 n.6 (C.D. Cal. Nov. 24, 2021) (order) (noting Facebook, Inc. has changed its name to Meta Platforms, Inc.).

Appellant described himself as not an "emotional guy." And he stated that he had heard people describe him as "cold," "distant," "manipulative," and "calculat[ed]." Appellant also agreed that he "plan[ned] ahead." And he stated that law enforcement officers did not tell him the cause of the complainant's death. Appellant admitted that he did not have dinner with the complainant on February 19, 2019, which he had previously told law enforcement officers he had done, and he stated that he must have gotten his days "mixed up."

Appellant testified that when the complainant was in town, she usually took the child to daycare. And the complainant was in town on February 21, 2019. Appellant agreed that if the complainant was in town, it was "very unlikely" that she would ask appellant to take the child to daycare in the morning, especially on a day that she was going to work. And on February 21, 2019, the complainant was supposed to go to work. The complainant would have had to drive past the daycare on the way to her work.

Appellant agreed that he should not have gone over to Davis's home on the morning of February 21, 2019, and he should not have gone to work at 5:00 a.m. because he was supposed to take the child to daycare on the morning of February 21, 2019. His decision to drive to work did not make sense if he was supposed to take the child to daycare. Appellant stated that his behavior on February 20, 2019 and February 21, 2019 was "odd," and he agreed that his behavior was "extremely

82

suspicious." Appellant also agreed that after receiving Mikel's text messages on February 21, 2019 and telling Mikel that he would call the complainant, he should have actually called the complainant.

As to his finances, appellant stated that in 2019 his "[t]otal compensation" was $142,900.02, but his direct compensation was $111,367.03 and he would have received less than that after taxes.[53] The $15,000 loan that appellant took out against the child's account was used for the remodeling of appellant's house. And appellant admitted that he withdrew $6,500 from the child's account. Appellant also noted that he was over his credit limit on his credit card, and his SUV was repossessed in 2020 for his failure to make payments.[54]

## Sufficiency of Evidence

In his first issue, appellant argues the evidence is legally insufficient to support his conviction because "[n]o direct evidence . . . link[ed] [a]ppellant to the

---

[53] A copy of appellant's "Total Compensation Statement" for 2018 was admitted into evidence and it stated that his "[b]ase [e]arnings" were about $93,000.

[54] We note that additional witnesses testified at trial and additional evidence was admitted into evidence. The Court has reviewed the complete record in the instant appeal, including all testimony and evidence presented during trial. *See* TEX. R. APP. P. 47.1, 47.4; *Sullivan v. Arguello Hope & Assocs., PLLC*, No. 03-18-00144-CV, 2018 WL 6424200, at *1 n.2 (Tex. App.—Austin Dec. 7, 2018, no pet.) (mem. op.) ("Because the parties are familiar with the facts of the case and its procedural history, we do not recite them in this opinion except as necessary to advise the parties of the Court's decision and the basic reasons for it."); *see also Obernhoff v. Nelson*, No. 01-17-00816-CV, 2019 WL 4065017, at *18 n.19 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op.) (noting appellate court reviewed complete record).

murder of [the complainant]," "there was no evidence that [a]ppellant's [SUV] or his cell[ular] [tele]phone w[ere] anywhere near [the complainant's] address at the suspected time of the murder or that he was the mysterious person observed on various [neighborhood] surveillance [video]tape[] [recordings]" near the time of the murder, "no forensic evidence was presented [at trial] that place[d] [a]ppellant at or near the scene of the murder at a time when the [complainant's] death occurred," "[a]ppellant was never identified nor was his [SUV] ever seen at or near [the complainant's] house during the early morning hours" on the day the complainant died, and "there [was] no evidence that [a]ppellant [was the person that] staged the [murder] scene" or "cleaned the scene."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We defer to the responsibility of the fact finder to resolve conflicts fairly in testimony, weigh the evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. That said, our

duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

We note that in reviewing the sufficiency of the evidence, a court must consider both direct and circumstantial evidence and any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (evidence-sufficiency standard of review same for both direct and circumstantial evidence). Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *See Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt. *See Wise*, 364 S.W.3d at 903; *Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict. *See Wise*, 364 S.W.3d at 903; *Hooper*, 214 S.W.3d at 13. The jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not to believe the witnesses, or any portion of their testimony.

*Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870

S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

A person commits the offense of murder if he intentionally or knowingly

causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). A

person also commits the offense of murder if he intends to cause serious bodily

injury and commits an act clearly dangerous to human life that causes the death of

an individual.[55] *See id.* § 19.02(b)(2). A person acts intentionally, or with intent,

with respect to the result of his conduct when it is his conscious objective or desire

to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts

knowingly, or with knowledge, with respect to a result of his conduct when he is

aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b); *see*

*also Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) ("Murder is

a 'result of conduct' offense, which means that the culpable mental state relates to

the result of the conduct, i.e., the causing of the death."). "'Serious bodily injury'

means bodily injury that creates a substantial risk of death or that causes death,

---

[55]     Here, the indictment alleged that appellant committed the offense of murder under both theories, and the trial court instructed the jury accordingly. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). In response to the trial court's charge, the jury returned a general verdict of guilty. When a trial court submits alternative theories of conviction to the jury, and the jury returns a general verdict, we will uphold the verdict if the evidence is sufficient to support any one of the alternative theories. *See Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005); *see also Hollins v. State*, Nos. 01-14-00744-CR, 01-14-000745-CR, 2015 WL 5076298, at *4 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, pet. ref'd) (mem. op., not designated for publication).

serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46).

"Intent is almost always proven by circumstantial evidence." *Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi–Edinburg 2006, pet. ref'd); *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) ("Direct evidence of the requisite intent is not required . . . ."); *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). "A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime, and from the nature of wounds inflicted on the victim[]." *Trevino*, 228 S.W.3d at 736. A jury may also infer knowledge from such evidence. *See Stahle v. State*, 970 S.W.2d 682, 687 (Tex. App.—Dallas 1998, pet. ref'd); *Martinez v. State*, 833 S.W.2d 188, 196 (Tex. App.—Dallas 1992, pet. ref'd). In determining a defendant's guilt, a jury may consider events that occur before, during, and after the commission of an offense. *See Pitonyak v. State*, 253 S.W.3d 834, 844–45 (Tex. App.—Austin 2008, pet. ref'd); *Martin v. State*, 151 S.W.3d 236, 245 (Tex. App.—Texarkana 2004, pet. ref'd); *see also King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (jury may consider evidence showing consciousness of guilt).

The evidence presented at trial shows that the complainant's body was found naked in the bathtub in her home on February 21, 2019. There is no evidence that

the complainant died from natural causes, a "slip and fall," an accident, or from suicide. When law enforcement officers found the complainant, she had blood in her hair and "[a] large wound on the left side of the top of her head." The wound was "a really jagged gash in her head." The complainant's eye was "bruised and swollen," and she was "bleeding from the nose."

Dr. Chundru, who performed the autopsy on the complainant's body, testified that the complainant had a large laceration on the left side of her scalp. Her left eye was swollen and discolored, and there was an abrasion or contusion on her left facial cheek. Dr. Chundru described the laceration on the left side of the complainant's scalp as "a pretty extensive injury." The complainant also had bruising on the right side of her scalp and a "fresh" bruise on her hand.

Underneath the complainant's head laceration, Dr. Chundru found multiple skull fractures. The multiple skull fractures would have resulted from the complainant being hit "with, like, a hammer or something like that." Either the complainant's head hit an object multiple times or an object hit the complainant's head multiple times. Dr. Chundru opined that multiple "blow[s]" to the complainant's head produced her skull fractures. The skull fractures likely caused the complainant's eye-bruising because blood would have seeped into her eyelids as a result of the fractures.

Because the complainant had been hit in the head, the complainant had a hemorrhage around and within her brain and the complainant had bruising of the brain. According to Dr. Chundru, the hemorrhages in or around the complainant's brain and the bruising on the complainant's brain constituted signs of the complainant suffering "pretty severe trauma." The complainant had a subarachnoid hemorrhage, meaning that blood was directly touching the complainant's brain tissue and irritating the brain, which could have caused the complainant to die because the irritation would have caused the complainant's heart and lungs to stop functioning. The complainant also had a subdural hemorrhage, which would have caused her to die because "when it gets so big . . . it pushes on the brain." The bruising on the complainant's brain would also have irritated her brain.

In summation, Dr. Chundru testified that the complainant's cause of death was blunt force head injuries. A number of different blunt and hard objects could have caused the blunt force injuries to the complainant's head, including the wine bottle found near the complainant in the primary bathroom.[56] Either the complainant's injuries were caused by the object striking the complainant's head repeatedly or the complainant's head striking the object repeatedly. According to Dr. Chundru, blunt force was used on the left side of the complainant's skull,

---

[56] The wine bottle had the complainant's blood and hair on it.

which caused multiple fractures and bleeding in her brain and resulted in the complainant's death. The blunt force used by the person who killed the complainant could have caused serious bodily injury and death. This evidence supports a finding that someone intentionally or knowingly caused the death of the complainant or that someone intended to cause serious bodily injury to the complainant and committed an act clearly dangerous to human life that caused the death of the complainant.[57] *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2); *see also Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018) ("The defendant's culpable mental state may . . . be inferred from the extent of the [complainant's] injuries.").

Appellant argues that the evidence is legally insufficient to show that he was the person who intentionally or knowingly caused the death of the complainant or the person who intended to cause serious bodily injury to the complainant and committed an act clearly dangerous to human life that caused the death of the complainant because "[n]o direct evidence . . . link[ed] [a]ppellant to the murder of [the complainant]," "there was no evidence that [a]ppellant's [SUV] or his cell[ular] [tele]phone w[ere] anywhere near [the complainant's] address at the suspected time of the murder or that [appellant] was the mysterious person

---

[57] The jury need not unanimously agree on the manner or the means of the commission of the complainant's murder. *See Sanchez v. State*, 376 S.W.3d 767, 773–74 (Tex. Crim. App. 2012); *Ngo v. State*, 175 S.W.3d 738, 746 n.27 (Tex. Crim. App. 2005).

observed on various [neighborhood] surveillance [video]tape[] [recordings]" near the time of the murder, "no forensic evidence was presented [at trial] that place[d] [a]ppellant at or near the scene of the murder at a time when the [complainant's] death occurred," "[a]ppellant was never identified nor was his [SUV] ever seen at or near [the complainant's] house during the early morning hours" on the day the complainant died, and "there [was] no evidence that [a]ppellant [was the person that] staged the [murder] scene" or "cleaned the scene."

But circumstantial evidence is just as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *See Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. A lack of physical or forensic evidence tying a defendant to a murder scene is only a factor for the jury to consider in weighing the evidence. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006); *see also Sample v. State*, No. 05-19-01254-CR, 2021 WL 3042670, at *11–12 (Tex. App.—Dallas July 19, 2021, no pet.) (mem. op., not designated for publication) (holding evidence sufficient to support defendant's murder conviction despite fact that State offered no forensic evidence linking defendant to murder); *Cuellar v. State*, No. 08-18-00133-CR, 2021 WL 2184512, at *6–7 (Tex. App.—El Paso May 28, 2021, no pet.) (not designated for publication) (holding evidence sufficient to support capital murder conviction even

though defendant argued no physical evidence connected him to murder scenes); *Binder v. State*, No. 2-01-447-CR, 2003 WL 298380, at \*1 (Tex. App.—Fort Worth Feb. 13, 2003, no pet.) (mem. op., not designated for publication) (lack of physical evidence in case did not make evidence insufficient to support conviction). The law requires no particular type of evidence. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018).

Here, the jury heard evidence that appellant had a motive to kill the complainant. Although motive is not an element of the offense of murder, such evidence is relevant as a circumstance tending to prove guilt. *See Nelson v. State*, 405 S.W.3d 113, 124 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *Russo v. State*, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet. ref'd); *see also Barrientos v. State*, 539 S.W.3d 482, 493 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("Evidence showing motive to commit murder is a significant circumstance indicating guilt . . . ." (internal quotations omitted)).

At trial, the State presented evidence that on February 20, 2019, the day before she died, the complainant filed a motion to modify requesting that appellant be required to pay child support in an amount greater than the support he had been paying under the previously established temporary order. Appellant was aware of the complainant's filing of the motion to modify and that the complainant was seeking more money from him to support the child. Appellant was also aware that

the complainant made more money than he did but she still wanted him to pay child support. The complainant was afraid of appellant and of what his reaction would be to her filing the motion to modify.

The State further presented evidence as to why the complainant's filing of the motion to modify would have prompted appellant to kill the complainant. Notably, appellant was in a difficult financial situation at the time of the complainant's death. He was spending a large amount of money remodeling his home and on his mortgage. Appellant was over his credit limit on his credit card at the time of the complainant's death, he was behind on his car payments, and he had taken out a $15,000 loan against the child's account. Between December 2018 and March 2019, appellant withdrew $21,500 from the child's account, which was money designated for the child's necessities. Appellant's mother expressed concern about appellant losing his home on the day the complainant died. Yet, if the complainant had been successful on her motion to modify, appellant would have been required to pay more child support than he had been paying under the temporary order that had been in place for almost two years. *See Nelson*, 405 S.W.3d at 124 (noting State presented evidence that defendant had "a financial motive to murder the complainant"); *Russo*, 228 S.W.3d at 794 (at time of murder, defendant was having financial difficulties).

The State also presented evidence that appellant was controlling and manipulative over the complainant and the child. And the complainant had recently ended her relationship with appellant and forced him to move out of her home. Appellant, before the complainant's death, had made comments about it being easier to care for the child when the complainant was not around, and appellant had previously withheld access to the child when the complainant traveled for work. On the day of the complainant's death, appellant ensured that he had custody and control over the child.

Additionally, the State presented evidence that appellant was selfish and self-centered. He was verbally and emotionally abusive to the complainant and frequently engaged in infidelity. *See Nisbett*, 552 S.W.3d at 265 (relationship difficulty can establish motive for murder); *Nelson*, 405 S.W.3d at 124 (evidence of affair during relationship may provide motive for partner's murder). Appellant had previously threatened the complainant that "he knew people that could make her disappear" if she acted in a way that he did not like. *See Nisbett*, 522 S.W.3d at 265–66 ("Prior behavior by the defendant toward the deceased can also be relevant to a determination of whether the defendant murdered the [complainant].").

The State also presented evidence that appellant had the opportunity to kill the complainant. *See id.* at 265 ("Opportunity when coupled with motive . . . is

94

indicative of guilt."). On the night of February 20, 2019 and into the early morning of February 21, 2019, appellant was alone. He sent Davis a message on his cellular telephone through Facebook Messenger around 10:14 p.m. on February 20, 2019, but appellant did not send any more messages to Davis or anyone else that night. And appellant did not send Davis another message on his cellular telephone until 3:18 a.m. on February 21, 2019. That left a period of about five hours where appellant was not in contact with anyone.

Further, the State presented evidence that appellant's house was only about fifteen minutes away from the complainant's house. Appellant had a key to the back door of the complainant's home, and he knew that the surveillance video camera at the back of the complainant's house did not work. The back door to the complainant's home was found unlocked by law enforcement officers later in the day on February 21, 2019.

Additionally, the State presented evidence that the complainant's cellular telephone was found on the foot of the bed in the primary bedroom in an odd location. Although a text message was sent from the complainant's cellular telephone to appellant at 2:31 a.m., the text message was written in a style that resembled appellant's style of texting, rather than the complainant's style of texting. Appellant, having previously lived in the complainant's home, would have also known that there was a wine refrigerator in the primary bedroom and that

there were wine bottles in the "his" side of the "his and her" closets in the primary bedroom. It is likely that a wine bottle was used in the commission of the complainant's murder.[58]

Although appellant notes that no evidence presented at trial showed that his cellular telephone was near the complainant's house around the suspected time of her death and that his car was not seen near the complainant's home in the early morning hours of February 21, 2019, the absence of such evidence does not establish that appellant was not at the complainant's home when the complainant was killed.[59] *See, e.g.*, *Floyd v. State*, No. 02-22-00082-CR, 2023 WL 2033831, at *6 (Tex. App.—Fort Worth Feb. 16, 2023, pet. filed) (mem. op., not designated for publication) (holding evidence sufficient to support aggravated robbery conviction even though no "cell-phone evidence" showed defendant "was in Fort Worth on the day of the incident").

And we note that the record is replete with inconsistent statements by appellant and implausible explanations from appellant.[60] *See Guevara v. State*, 152

---

[58] A wine bottle, with the complainant's blood and hair on it, was found near the complainant's body in the primary bathroom.

[59] The jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not to believe the witnesses or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

[60] Due to their volume, we do not specifically detail all of appellant's inconsistent statements and implausible explanations that are contained in the record. *See* TEX. R. APP. P. 47.1.

S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."); *see also Nisbett*, 552 S.W.3d at 266 (inconsistencies in defendant's story provide evidentiary support for conviction); *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (inconsistent statements and implausible explanations to law enforcement are strong evidence of defendant's consciousness of guilt). As detailed above, appellant asserted, among other things, that on the night of February 20, 2019, he started painting his home around 10:15 p.m. He painted for two or three hours, and he purportedly woke up about 3:00 a.m.—earlier than he normally did for work.

Further, after waking up early, appellant drove an hour to work, arriving an hour earlier than he normally did. Appellant agreed that this was "unusual" and "abnormal" behavior for him. Appellant made the hour-long drive to work even though he asserted that the complainant and he had planned for him to take the child to daycare that morning[61] and even though his early arrival to work had not been preapproved by his supervisor.

---

[61] Although appellant asserted that it was the plan that he would drop off the child at daycare on February 21, 2019, no one at the daycare was ever informed of this plan, which was unusual.

Additionally, according to appellant, although he used his cellular telephone to contact Davis in the early morning hours of February 21, 2019, he claimed that he did not see the text message from the complainant's cellular telephone until he was at work around 5:00 a.m. He then immediately left work and drove an hour back to Lake Jackson to pick up the child. Appellant made no attempt to call the complainant after he received the abnormal text message from her cellular telephone or during the entire time that he drove to her home. At trial, appellant agreed that it would have made sense for him to call the complainant that morning.

Upon arriving at the complainant's house around 6:45 a.m., appellant walked straight into the complainant's home, without knocking, even though he no longer lived there. Appellant also had a different key in his hand than his large set of keys that he had previously used to enter the complainant's house on February 11, 2019, when he still lived there. When appellant left the complainant's home carrying the child, he was no longer carrying a key.[62] Appellant then took the child from the complainant's home without ever speaking to the complainant. As Texas Ranger Norsworthy explained, in discussing the events of February 21, 2019, appellant told "an unbelievable story" about how he "essentially st[ole] [the child] from the [complainant's] house without any direct communication with [the complainant]" on the morning of February 21, 2019. Appellant dropped the child

---

[62] A key was later found in the complainant's front door by Yolanda and law enforcement officers.

off at daycare more than forty minutes earlier than normal and without the child's normal lunch.

At trial, appellant acknowledged that if the complainant was in town, then it was "very unlikely" that she would have asked appellant to take the child to daycare in the morning, especially on a day that she was going to work. And on February 21, 2019, the complainant was supposed to go to work. The complainant would have had to drive past the daycare on the way to work that morning. Appellant also agreed that his decision to drive an hour to work on the morning of February 21, 2019 did not make any sense if he was also supposed to take the child to daycare that morning. *See Longoria v. State*, 154 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (attempts to create false alibi are evidence of guilt). And appellant acknowledged that his behavior on February 20, 2019 and February 21, 2019 was "odd" and "extremely suspicious." *See Washington v. State*, 567 S.W.3d 430, 439 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (jury could infer defendant's guilt by his strange behavior); *see also Johnson v. State*, Nos. 14-17-00312-CR, 14-17-00313-CR, 2018 WL 3911148, at *4 (Tex. App.—Houston [14th Dist.] Aug. 16, 2018, no pet.) (mem. op., not designated for publication) ("out of the ordinary behavior" supported reasonable inference of consciousness of guilt (internal quotations omitted)); *Bunsow v. State*, No. 08-07-00066-CR, 2009 WL 146503, at *7 (Tex. App.—El Paso Jan. 22, 2009,

pet. ref'd) (not designated for publication) (jury could have inferred that defendant's odd behavior was indication of guilt).

We also note that appellant's guilt may generally be inferred from his words and actions.[63] *See Ex parte Weinstein*, 421 S.W.3d at 668. The State presented evidence that when Detective Bailey and Detective Hawkins arrived at appellant's house on the night of February 21, 2019, after the complainant's death, appellant did not ask the officers why they were there to see him. And appellant only responded, "You're kidding me," when he was told of the complainant's death. On the night of February 21, 2019 and afterward, appellant appeared emotionless regarding the complainant's death. Following the complainant's death, appellant "lacked empathy in her death" and instead focused on himself and the hardships that her death had caused him. Appellant never appeared "rattled" or "freaked out" by the complainant's death. And he never expressed a desire to find her "true killer."

The State also presented evidence that appellant, when he returned to work on February 25, 2019—four days after the complainant's death—told multiple co-workers that the complainant's body had been found in the bathtub or in the bathroom of her home—information that law enforcement officers purposefully

---

[63] In addition to what is discussed below, we note that the background section details numerous words and actions by appellant from which his guilt could be inferred. *See* TEX. R. APP. P. 47.1.

100

did not disclose to appellant. *See McDaniel v. State*, No. 14-08-1085-CR, 2010 WL 1704741, at *6 (Tex. App.—Houston [14th Dist.] Apr. 29, 2010, no pet.) (not designated for publication) (information contained in defendant's confession "could only have been provided by someone who knew details concerning the shooting or was present when [the complainant] was shot"). Appellant also had sexual intercourse with a co-worker on February 25, 2019 at a hotel after work and before returning to Lake Jackson. And during law enforcement officers' investigation of the complainant's death, they found artwork depicting a nude female in a bathtub on appellant's new cellular telephone that he purchased after the complainant's death. *Cf. Dorsey v. State*, 117 S.W.3d 332, 335–36 (Tex. App.—Beaumont 2003, pet. ref'd) (evidence in murder trial that defendant rented movie with plot similar to events surrounding murder was relevant to motive and intent).

Viewing all of the evidence presented at trial in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant intentionally or knowingly caused the death of the complainant or appellant intended to cause serious bodily injury to the complainant and committed an act clearly dangerous to human life that caused the death of the complainant. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). Accordingly, we hold that the evidence is legally sufficient to support appellant's

conviction for the offense of murder. *See Temple v. State*, 390 S.W.3d 341, 359–63 (Tex. Crim. App. 2013) (analogous case holding evidence sufficient to support defendant's conviction for offense of murder).

We overrule appellant's first issue.

## Motion to Suppress

In his second issue, appellant argues that the trial court erred in denying his motion to suppress certain evidence recovered from his SUV because "there [was] no evidence within the four corners of the [search warrant] affidavit that place[d] [a]ppellant's [SUV] at or near the murder scene at the time the murder allegedly occurred," which rendered the search warrant for his SUV invalid.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *See Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.* At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility, and it may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as here, a trial court does not make explicit findings of fact, we review the evidence in a light most favorable to the trial court's ruling, and we assume that the

trial court made implied findings of fact that support its ruling as long as those findings are supported by the record. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35–36 (Tex. Crim. App. 2017); *see also Walter v. State*, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000). We give almost total deference to a trial court's implied findings, especially those based on an evaluation of witness credibility or demeanor. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* at 447–48. This is so even if the trial court gives the wrong reason for its decision. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003); *State v. Brabson*, 899 S.W.2d 741, 745–46 (Tex. App.—Dallas 1995), *aff'd*, 976 S.W.2d 182 (Tex. Crim. App. 1998).

The Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution protect individuals from unreasonable searches and seizures. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; *State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013). The Fourth Amendment requires that "no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation." U.S. CONST. amend IV; *see also* TEX. CONST. art. I, § 9; TEX. CODE CRIM. PROC. ANN. art. 1.06. A search warrant may be obtained from a magistrate only upon the submission of an affidavit setting forth substantial facts establishing probable cause. TEX. CODE CRIM. PROC. ANN. art. 18.01(b). The affidavit must set

forth specific facts establishing that a specific offense has been committed, the item to be seized constitutes evidence of the offense or evidence that a particular person committed the offense, and that the item is located at, or on the person, place, or thing to be searched. TEX. CODE CRIM. PROC. ANN. art. 18.01(c).

When a magistrate construes a probable cause affidavit, he is permitted to "interpret the affidavit in a non-technical, common-sense manner and may draw reasonable inferences from the facts and circumstances contained within its four corners." *State v. Jordan*, 342 S.W.3d 565, 569 (Tex. Crim. App. 2011). On a complaint that evidence obtained during a search should be suppressed because the magistrate had no probable cause to issue a search warrant, we apply a "great deference" standard of review to the magistrate's determination of probable cause. *Id.* "Probable cause exists if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a 'fair probability' that contraband or evidence of a crime will be found in a particular place at the time the warrant is issued." *Id.* at 568–69 (internal footnote omitted). In our review of the magistrate's determination, we determine whether "'the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* at 569 (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). And we employ a totality-of-the-circumstances analysis. *Gates*, 462 U.S. at 230–37. The Texas Court of Criminal Appeals has explained: "The issue is not whether there are other

104

facts that could have, or even should have, been included in the affidavit;" instead, "we focus on the combined logical force of the facts that are in the affidavit." *Rodriguez v. State*, 232 S.W.3d 55, 62 (Tex. Crim. App. 2007) (emphasis omitted). And the truthfulness of the factual showing providing probable cause for a warrant does not mean "'truthful[ness]' in the sense that every fact recited in the [search] warrant affidavit is necessarily correct." *Franks v. Delaware*, 438 U.S. 154, 165, (1978). "[S]o long as the magistrate had a substantial basis for . . . conclud[ing] that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (second and third alterations in original) (internal quotations omitted).

Appellant argues that the trial court erred in denying his motion to suppress certain evidence recovered from his SUV, i.e., "pleadings" and a "receipt from a [barbecue] restaurant," because the affidavit supporting the search warrant for his SUV contained "no evidence . . . that place[d] [a]pellant's [SUV] at or near the murder scene at the time the murder allegedly occurred."

Here, for purposes of this opinion, we will presume, without deciding, that law enforcement officers' search of appellant's SUV violated the Fourth Amendment and the trial court erred in denying appellant's motion to suppress. *Cf. Uvukansi v. State*, No. 01-14-00527-CR, 2016 WL 3162166, at *8 (Tex. App.—Houston [1st Dist.] June 2, 2016, pet. ref'd) (mem. op., not designated for

publication).  Notably though, when the trial court erroneously denies a motion to suppress and admits evidence obtained in violation of the Fourth Amendment, that error is subject to a harm analysis.  *See* TEX. R. APP. P. 44.2(a); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001); *Santiago v. State*, No. 04-19-00317-CR, 2020 WL 4808723, at *1 (Tex. App.—Amarillo Aug. 19, 2020, no pet.) (mem. op., not designated for publication); *see also Marcopoulos v. State*, 548 S.W.3d 697, 707 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (appellate court must determine whether trial court's erroneous denial of motion to suppress harmed defendant).  We must reverse the trial court's judgment of conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment."  TEX. R. APP. P. 44.2(a); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008); *Uvukansi*, 2016 WL 3162166, at *8.  In applying the harmless-error test, the primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction.  *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (internal quotations omitted).

We are directed that our harm analysis should not focus on the propriety of the outcome of the trial.  Instead, we must calculate, as much as possible, the probable impact of the evidence on the jury in light of the existence of other evidence.  *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).  We

106

"should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment,'" and if applicable, we may consider the nature of the error, the extent that it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting TEX. R. APP. P. 44.2(a)). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner and not "in the light most favorable to the [State]." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989) (internal quotations omitted), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22; *Daniels v. State*, 25 S.W.3d 893, 899 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Error does not contribute to the conviction or punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007).

Although appellant asserts in his briefing that the trial court erred in denying his motion to suppress certain evidence recovered from his SUV, he wholly fails to explain whether or how that erroneous ruling contributed to his conviction or punishment. *See* TEX. R. APP. P. 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of

107

appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."); *cf. Martinez v. State*, No. 13-21-00191-CV, 2022 WL 3724107, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 30, 2022, no pet.) (mem. op., not designated for publication) (defendant did not adequately brief complaint trial court erred in denying his motion to suppress where he did not explain whether or how that ruling contributed to his conviction or punishment).

To assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000); *Wilson v. State*, 473 S.W.3d 889, 901 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). Here, appellant's brief contains no argument, substantive analysis, or citation to authorities or to the record to show that he was harmed by the trial court's purported erroneous denial of his motion to suppress evidence. *See* TEX. R. APP. P. 38.1(i); *Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000) ("We will not make appellant's arguments for him . . . ."); *Alvarado v. State*, 912 S.W.2d 199, 210 (Tex. Crim.

App. 1995) (where appellant's point of error inadequately briefed, appellant "presents nothing for our review"); *Lawton v. State*, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995) (failure to adequately brief issue, either by failing to specifically argue and analyze one's position or provide authorities and record citations, waives any error on appeal), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998); *see also Reule v. M & T Mortg.*, 483 S.W.3d 600, 615 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("[W]ithout proper citation, the voluminous nature of th[e] record makes it difficult to discern where there is any support for many of [appellant's] complaints."). Accordingly, we hold that appellant waived his complaint that the trial court erred in denying his motion to suppress because of inadequate briefing. *See, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Wilson*, 473 S.W.3d at 900–01 (holding defendant waived complaint trial court erred in admitting certain evidence because brief did not contain any argument that he was harmed by purportedly erroneous admission); *see also Leleo v. State*, Nos. 01-20-00034-CR, 01-20-00035-CR, 2022 WL 243917, at *37–38 (Tex. App.—Houston [1st Dist.] Jan. 27, 2022, no pet.) (mem. op., not designated for publication) (declining to address issue that was inadequately briefed and explaining not appellate court's role to construct defendant's argument for him).

109

## Admission of Evidence

In his third issue, appellant argues that the trial court erred in admitting certain testimony and other evidence because its admission "violated the attorney[-]client privilege." *See* TEX. R. EVID. 503. In his fourth, sixth, eighth, ninth, and eleventh issues, appellant argues that the trial court erred in admitting certain testimony and other evidence because it constituted hearsay. In his fifth, seventh, tenth, and twelfth issues, appellant argues that the trial court erred in admitting certain testimony and other evidence because it violated his Sixth Amendment right "to be confronted with the witnesses against him." *See* U.S. CONST. amend. VI.

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). We will uphold a trial court's

evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## A. Attorney-Client Privilege

In his third issue, appellant argues that the trial court erred in admitting the testimony of Wilson, a legal assistant employed by appellant's attorney, about "communications between [a]ppellant's attorney's office [and appellant] regarding [the] motion to modify . . . filed [by the complainant] on February 20, 2019" and the copy of a February 21, 2019 email from Wilson to appellant because their admission "violated the attorney[-]client privilege." *See* TEX. R. EVID. 503.

"In general, privileges are exclusionary rules of evidence that may be used to suppress relevant evidence." *McAfee v. State*, 467 S.W.3d 622, 642–43 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (internal quotations omitted). We review the trial court's ruling denying applicability of a privilege for an abuse of discretion. *Porter v. State*, 513 S.W.3d 695, 700 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). We will reverse the trial court's ruling only if "the trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion." *Porter*, 513 S.W.3d at 700 (internal quotations omitted). The party asserting a privilege has the burden of

111

showing that the privilege applies. *Porter*, 513 S.W.3d at 700; *McAfee*, 467 S.W.3d at 643.

The Texas Rules of Evidence protect from disclosure the communications between a client and his counsel when they are kept confidential and are made to facilitate the rendition of legal services. *See* TEX. R. EVID. 503(b)(1); *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *Porter*, 513 S.W.3d at 700. The scope of the privilege is limited to communications "made by a client seeking legal advice from a lawyer in [the lawyer's] capacity as such and the communication must relate to the purpose for which the advice is sought." *Porter*, 513 S.W.3d at 700 (alteration in original) (internal quotations omitted); *see also State v. DeAngelis*, 116 S.W.3d 396, 403–04 (Tex. App.—El Paso 2003, no pet.).

The application of the attorney-client privilege depends on whether the communication sought to be protected is "confidential." *Austin v. State*, 934 S.W.2d 672, 674 (Tex. Crim. App. 1996) (internal quotations omitted); *Williams v. State*, 417 S.W.3d 162, 185–86 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). "A communication is 'confidential' if not intended to be disclosed to third persons other than those" to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication. TEX. R. EVID. 503(a)(5); *see also McAfee*, 467 S.W.3d at 642.

Disclosure by the attorney does not waive the privilege absent the client's consent. *Porter*, 513 S.W.3d at 700; *McAfee*, 467 S.W.3d at 643. The client can waive the privilege by voluntarily disclosing or consenting to the disclosure of a significant part of the privileged matter. TEX. R. EVID. 511; *McAfee*, 467 S.W.3d at 643.

Here, we will presume, for purposes of this opinion, that the trial court erred in admitting the complained-of portion of Wilson's testimony about "communications between [a]ppellant's attorney's office [and appellant] regarding [the] motion to modify . . . filed [by the complainant] on February 20, 2019" and the copy of a February 21, 2019 email from Wilson to appellant about the motion to modify because it violated the attorney-client privilege. But we must still perform a harm analysis to determine if the trial court's purported error requires reversal of the trial court's judgment. *See Wright v. State*, 374 S.W.3d 564, 580–81 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (presuming, without deciding, trial court erred in admitting evidence in violation of attorney-work-product privilege and performing harm analysis); *Sanford v. State*, 21 S.W.3d 337, 344–47 (Tex. App.—El Paso 2000, no pet.) (after concluding trial court erred in admitting certain testimony in violation of attorney-client privilege, conducting harm analysis), *abrogated on other grounds by Motilla v. State*, 78 S.W.3d 352, 356 n.25 (Tex. Crim. App. 2002); *see also Pierce v. State*, No.

113

03-03-00536-CR, 2005 WL 1842759, at *3 (Tex. App.—Austin Aug. 3, 2005, no pet.) (mem. op., not designated for publication) (explaining if trial court erred in admitting testimony in violation of attorney-client privilege, appellate court may reverse only if error affected substantial rights).

The admission of evidence in violation of the attorney-client privilege constitutes non-constitutional error. *See Sanford*, 21 S.W.3d at 344–45; *see also Olejnik v. State*, No. 13-10-307-CR, 2011 WL 2475503, at *4–5 (Tex. App.—Corpus Christi–Edinburg June 23, 2011, pet. ref'd) (mem. op., not designated for publication); *Pierce*, 2005 WL 1842759, at *3. Non-constitutional error requires reversal only if it affects the substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

We review the entire record to determine the effect or influence of the wrongfully admitted evidence on the jury's decision. *Id.*; *Motilla*, 78 S.W.3d at 355–56. In assessing the likelihood that the jury's decision was improperly

114

influenced, we consider the testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94; *Motilla*, 78 S.W.3d at 355–56. The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis. *Neal*, 256 S.W.3d at 285; *see also Motilla*, 78 S.W.3d at 355–60. And we may consider closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error. *Motilla*, 78 S.W.3d at 355–56; *Hankins v. State*, 180 S.W.3d 177, 182 (Tex. App.—Austin 2005, pet. ref'd).

Appellant fails to assert in his briefing that he was harmed by the admission of the complained-of portion of Wilson's testimony and the admission of the February 21, 2019 email from Wilson to appellant. *See Petriciolet v. State*, 442 S.W.3d 643, 653–55 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (even if trial court improperly admitted evidence, appellate court must still determine whether defendant was harmed by erroneous admission); *see, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding defendant waived complaint on appeal because he inadequately briefed issue by failing to address whether alleged error was harmless); *Chaves v. State*, 630 S.W.3d 541, 555, 557–58 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding defendant waived complaint trial court erred in

admitting certain evidence because he "failed to adequately brief his assertion that he was harmed by the admission of" complained-of evidence); *Ford v. State*, No. 01-17-00213-CR, 2018 WL 1473948, at *6 (Tex. App.—Houston [1st Dist.] Mar. 27, 2018, no pet.) (mem. op., not designated for publication) (appellate court need not determine whether trial court erred in admitting exhibits where defendant did not argue in briefing that he was harmed by purportedly erroneous admission of exhibits); *Wilson*, 473 S.W.3d at 900–01 ("Here, we do not address whether the trial court erred in admitting the complained-of extraneous-offense evidence because even were we to conclude that the trial court erred in admitting such evidence, appellant, in his brief, does not argue that he was harmed by its admission.").

To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008); *Chaves*, 630 S.W.3d at 555, 557–58. As the Texas Court of Criminal Appeals has emphasized, an appellate court has no obligation to construct and compose issues, facts, and arguments with

116

appropriate citations to authorities and the record for the appellant. *See Wolfe v. State*, 509 S.W.3d 325, 342–43 (Tex. Crim. App. 2017); *Busby*, 253 S.W.3d at 673; *see also Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . ."). A brief that does not comply with Texas Rule of Appellate Procedure 38.1 presents nothing for an appellate court to review. *See Alvarado*, 912 S.W.2d at 210.

Here, appellant's brief contains no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purportedly erroneous admission of the complained-of portion of Wilson's testimony and the admission of the February 21, 2019 email from Wilson to appellant. *See Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . ."). Accordingly, we hold that appellant has waived, due to inadequate briefing, his complaint on appeal that the trial court erred in admitting the complained-of portion of Wilson's testimony and the copy of a February 21, 2019 email. *See, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Chaves*, 630 S.W.3d at 557–58 (holding defendant waived complaint trial court erred in admitting certain evidence because appellant's brief "contain[ed] no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported

117

erroneous admission of the State's [evidence]"); *Ford*, 2018 WL 1473948, at *6; *Wilson*, 473 S.W.3d at 900–01 (defendant waived complaint trial court erred in admitting certain evidence where he failed to "identify[] the harm that he suffered as a result of the admission of the complained-of evidence").

**B.     Hearsay**

In his fourth issue, appellant argues that the trial court erred in admitting the testimony of Harris, a paralegal who previously worked with Terry, the complainant's attorney, about "conversations . . . she had with [the complainant] regarding the filing of [a] motion to modify" because "any statement made by [the complainant] to . . . Harris" was hearsay.  In his sixth issue, appellant argues that the trial court erred in admitting the testimony of Terry, the complainant's attorney, about "the details of [a] conversation . . . he had with [the complainant] concerning the filing of the motion to modify" because the testimony constituted hearsay.  In his eighth issue, appellant argues that the trial court erred in admitting the testimony of Weaver, the complainant's friend, about "statements . . . she made" to the complainant "during a conversation they [had] concerning [the complainant's] relationship with appellant" because "the statement[s] made by . . . Weaver were in fact hearsay."  In his ninth issue, appellant argues that the trial court erred in admitting the testimony of Kimberly, the complainant's cousin, about "her conversations with [the complainant] about [the complainant's]

118

relationship with [a]ppellant and that [the complainant's] text messages were being monitored" because the testimony constituted hearsay. In his eleventh issue, appellant argues that the trial court erred in admitting the testimony of Gaston, the complainant's therapist, about "statements made by [the complainant] about her relationship with [a]ppellant" because the statements constituted hearsay.

"Hearsay" is an out-of-court statement offered in evidence to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801(d) (internal quotations omitted). Hearsay is generally not admissible unless allowed by statute or rule. TEX. R. EVID. 802.

*1.    Harris*

In his briefing related to his fourth issue, appellant generally complains about Harris's testimony "concerning conversations that she had with [the complainant] regarding the filing of [a] motion to modify," but appellant provides minimal record citations to direct the Court to the specific portions of Harris's testimony about which he complains.[64] *See Thomas v. State*, 701 S.W.2d 653, 662

---

[64]    We note that an appellate court is not required to search the appellate record to determine if the record supports appellant's argument. *See Alvarado v. State*, 912 S.W.2d 199, 210 (Tex. Crim. App. 1995) (appellate court is not required "to pore through hundreds of pages of record in an attempt to verify an appellant's claims"); *Thierry v. State*, 288 S.W.3d 80, 86 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *see also Belle v. State*, 543 S.W.3d 871, 879 (Tex. App.— Houston [14th Dist.] 2018, no pet.) ("[W]e are under no duty to make an independent search of the record to determine whether an assertion of reversible error is valid."). The appellant bears the burden of showing that the record supports the contentions raised, and he must specify the place in the record where

(Tex. Crim. App. 1985) ("It is well settled that *mere reference to pages in the record does not sufficiently identify testimony*, objections thereto, and the court's rulings thereon to constitute a ground of error." (emphasis added)); *see also Reule*, 483 S.W.3d at 615 ("[W]ithout proper citation, the voluminous nature of th[e] record makes it difficult to discern where there is any support for many of [appellant's] complaints."). From what this Court can discern, appellant appears to complain about this portion of Harris's testimony:

matters upon which he relies or of which he complains are shown. *See Thomas v. State*, 701 S.W.2d 653, 662 (Tex. Crim. App. 1985) ("It is well settled that mere reference to pages in the record does not sufficiently identify testimony, objections thereto, and the court's rulings thereon to constitute a ground of error."); *In re C.A.J.*, No. 01-19-00704-CV, 2021 WL 243900, at *27 (Tex. App.—Houston [1st Dist.] Jan. 26, 2021, pet. denied) (mem. op.); *Gonzalez v. State*, No. 02-14-00229-CR, 2015 WL 9244986, at *4 (Tex. App.—Fort Worth Dec. 17, 2015, pet. ref'd) (mem. op., not designated for publication) ("Parties are required to provide citations to the record in support of their arguments . . . ."); *see also* TEX. R. APP. P. 38.1(i). Without appropriate record citations, a brief does not adequately present an issue for appeal. *See Toldson v. Denton Indep. Sch. Dist.*, No. 02-18-00394-CV, 2019 WL 6205245, at *13 (Tex. App.—Fort Worth Nov. 21, 2019, no pet.) (mem. op.). To the extent that appellant attempts to complain about portions of Harris's testimony other than those quoted above, we hold that his complaints are waived due to inadequate briefing. *See id.* at *12–14 (noting difficulties with imprecise citation to record and holding issue waived for inadequate briefing); *In re Caldwell-Bays*, No. 04-18-00980-CV, 2019 WL 1370316, at *8 (Tex. App.—San Antonio Mar. 27, 2019, orig. proceeding) (mem. op.) (noting party's citations to record were imprecise and identifying what court "believe[d] she [was] referring to"); *Parker v. State*, No. 02-12-00092-CR, 2013 WL 4714371, at *5 n.3 (Tex. App.—Fort Worth Aug. 30, 2013, pet. ref'd) (mem. op., not designated for publication) (addressing admission of testimony that appellate court could discern defendant complained about and holding, to extent defendant's argument could be construed to cover any other evidence, argument was waived due to inadequate briefing because of imprecise record citations).

| | |
|---|---|
| [State]: | So yesterday when we were speaking with the jury you mentioned that you had two conversations with [the complainant] regarding when the filing of that modification was going to occur; correct? |
| [Harris]: | Yes, ma'am. |
| [State]: | Okay. That very first conversation, can you remind us about when that was? |
| [Harris]: | It was February -- |
| [Appellant's attorney]: | . . . Objection. And frankly I can't remember what is on the record, but I'm going to object to this line of questioning based on attorney-client privilege, based on right to confront and based on hearsay. |
| The Court: | I'll overrule. |
| [State]: | . . . Can you tell us when the first conversation was? |
| [Harris]: | February 15th. |
| [State]: | Of what year? |
| [Harris]: | 2019. |
| [State]: | And the basis of that conversation, was it in regards to [the complainant] having concerns about when [the motion to modify] was going to be filed? |

121

[Harris]: Yes. She had -- she wanted to file the motion to modify to seek child support.

. . . .

[Harris]: And she wanted to wait until [appellant] had moved out of her residence.

[State]: Did she say why she wanted him to be moved out before that motion was actually filed?

[Harris]: Yes.

[State]: Why?

[Harris]: She said that he would be mad and she wanted to avoid any confrontation.

[State]: Okay. And then there was a subsequent follow-up conversation. Do you remember when that was?

[Harris]: February 20th. It was a -- the first conversation, I believe, was on a Friday. The second one was the following Wednesday. I contacted her to see if he had moved out of the residence. She said that he had. And I asked if she was ready to file the motion. She said, yes, she wanted to go ahead and file it to seek the child support.

. . . .

122

| | |
|---|---|
| [Harris]: | And she was concerned about when he would get a copy of it. |
| [State]: | Did she express why she was concerned when he would get a copy of it? |
| [Harris]: | Again, she knew he would be mad and she wanted to -- she -- she knew he would be mad, and she wanted to be aware of when to expect a phone call from him. |

The erroneous admission of evidence constitutes non-constitutional error. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Non-constitutional error requires reversal only if it affects the substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b); *Barshaw*, 342 S.W.3d at 93–94. The defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King*, 953 S.W.2d at 271. We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

We review the entire record to determine the effect or influence of the wrongfully admitted evidence on the jury's decision. *Id.*; *Motilla*, 78 S.W.3d at 355–56. In assessing the likelihood that the jury's decision was improperly influenced, we consider the testimony and physical evidence, the nature of the

123

evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94; *Motilla*, 78 S.W.3d at 355–56. The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis. *Neal*, 256 S.W.3d at 285; *see also Motilla*, 78 S.W.3d at 355–60. And we may consider closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error. *Motilla*, 78 S.W.3d at 355–56; *Hankins*, 180 S.W.3d at 182. Notably, error in the admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere at trial without objection. *See Leday v. State*, 983 S.W.2d 713, 717–18 (Tex. Crim. App. 1998).

Our review of the record reveals that Harris, in other portions of her testimony, stated, without objection, that she had a conversation with the complainant on February 15, 2019. Harris recounted that the complainant, prior to February 15, 2019, had met with Terry, her attorney, to discuss the filing of a motion to modify. Harris had called the complainant "to ask if she wanted to go forward with the modification, and she said yes."[65] Harris "asked [the

---

[65] Although appellant objected to this statement by Harris, appellant did not to do so based on hearsay. *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (objection stating one legal basis may not be used to support a different legal theory on appeal); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App.

complainant] if she was ready to go ahead and file it." And "[s]he said, no, that she had asked [appellant] to move out of the [her] residence and she didn't want to file it until he had moved out." The complainant "wanted to wait until [appellant] had] moved out of her home."

Further, we note that Terry, in portions of his testimony, stated, without objection, that the complainant had told him that "she was . . . afraid of" appellant. And that the complainant's "main point . . . was [that] she didn't want [appellant] to find out about th[e] motion [to modify] until after he was out of [her] house." Terry agreed not to file the motion to modify "until [appellant] was out of [the complainant's] house." Terry also stated that he knew the complainant "was very afraid of [appellant] and what his actions were capable of and she didn't want to make him mad." And the complainant had "mention[ed] [appellant's] temper and how mad he would get about certain things and how controlling he was and how he didn't like her being around her family and other people."[66]

As the Texas Court of Criminal Appeals has explained, the erroneous admission of evidence is harmless when "other [similar] evidence was received

1995); *see also Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) ("The point of error on appeal must comport with the objection made at trial.").

[66] Although appellant objected to this statement by Terry, appellant did not do so based on hearsay. *See Heidelberg*, 144 S.W.3d at 537 (objection stating one legal basis may not be used to support a different legal theory on appeal); *Broxton*, 909 S.W.2d at 918; *see also Clark*, 365 S.W.3d at 339 ("The point of error on appeal must comport with the objection made at trial.").

without objection, either before or after the complained-of ruling." *Coble*, 330 S.W.3d at 282 (internal quotations omitted); *see also Lane v. State*, 151 S.W.3d 188, 192–93 (Tex. Crim. App. 2004) (error in admission of evidence cured where same evidence comes in elsewhere without objection); *Leday*, 983 S.W.2d at 717–18 (erroneous admission of evidence is harmless when equivalent evidence is admitted elsewhere without objection); *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991) (error in admission of evidence may be rendered harmless when "substantially the same evidence" is admitted elsewhere without objection); *Pacheco v. State*, No. 01-18-00605-CR, 2020 WL 4299581, at *11 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op., not designated for publication) (defendant did not object to other portions of witness's testimony that were substantially similar to portion of testimony he complained of on appeal).

Based on the foregoing, we hold that even if the trial court erred in overruling appellant's hearsay objection to the above-quoted portion of Harris's testimony, any error was harmless because it was duplicative of evidence admitted elsewhere without objection. *See Burks v. State*, 876 S.W.2d 877, 897–98 (Tex. Crim. App. 1994) (holding law enforcement officer's erroneously admitted hearsay testimony did not harm defendant when testimony of other trial witnesses proved same facts); *Washington v. State*, 485 S.W.3d 633, 638–39 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (noting error in admission of evidence may be rendered

126

harmless when substantially same evidence is admitted elsewhere without objection).

We overrule appellant's fourth issue.

### 2. *Terry*

In his briefing related to his sixth issue, appellant generally complains about Terry's testimony "concerning the details of [a] conversation . . . he had with [the complainant] concerning the filing of the motion to modify," but he only directs this Court to one portion of Terry's testimony.[67] *See Thomas*, 701 S.W.2d at 662 ("It is well settled that *mere reference to pages in the record does not sufficiently identify testimony*, objections thereto, and the court's rulings thereon to constitute a ground of error." (emphasis added)); *see also Reule*, 483 S.W.3d at 615 ("[W]ithout proper citation, the voluminous nature of th[e] record makes it difficult to discern where there is any support for many of [appellant's] complaints."). In that portion of Terry's testimony, he stated:

---

[67] As previously stated, an appellate court is not required to search the appellate record to determine if the record supports appellant's argument. *See Alvarado*, 912 S.W.2d at 210; *Thierry*, 288 S.W.3d at 86; *see also Belle*, 543 S.W.3d at 879. The appellant bears the burden of showing that the record supports the contentions raised and must specify the place in the record where matters upon which he relies or of which he complains are shown. *See Thomas*, 701 S.W.2d at 662; *In re C.A.J.*, 2021 WL 243900, at *27; *Gonzalez*, 2015 WL 9244986, at *4; *see also* TEX. R. APP. P. 38.1(i). Without appropriate record citations, a brief does not adequately present an issue for appeal. *See Toldson*, 2019 WL 6205245, at *13. To the extent that appellant attempts to complain about a portion of Terry's testimony other than that which is quoted above, we hold that his complaints are waived due to inadequate briefing. *See id.* at *12–14; *In re Caldwell-Bays*, 2019 WL 1370316, at *8; *Parker*, 2013 WL 4714371, at *5 n.3.

| | |
|---|---|
| [State]: | And what -- can you tell us what she advised about her being afraid? |
| . . . . | |
| [Appellant's counsel]: | I'm going to object; hearsay and relevance. |
| The Court: | Overruled. |
| [Terry]: | She said she was afraid and concerned about [appellant] getting served with those papers while he was still in the house and she didn't want us to -- to serve his attorney until after he was out of the house. |

As noted above, the erroneous admission of evidence is harmless when "other [similar] evidence was received without objection, either before or after the complained-of ruling." *Coble*, 330 S.W.3d at 282 (internal quotations omitted); *see also Lane*, 151 S.W.3d at 192–93 (error in admission of evidence cured where same evidence comes in elsewhere without objection); *Leday*, 983 S.W.2d at 717–18 (erroneous admission of evidence is harmless when equivalent evidence is admitted elsewhere without objection); *Mayes*, 816 S.W.2d at 88 (error in admission of evidence may be rendered harmless when "substantially the same evidence" is admitted elsewhere without objection); *Pacheco*, 2020 WL 4299581, at *11 (defendant did not object to other portions of witness's testimony that were substantially similar to portion of testimony he complained-of on appeal).

Notably, Terry, in other portions of his testimony, stated, without objection, that the complainant told him that "she was . . . afraid of" appellant. And that the complainant's "main point . . . was [that] she didn't want [appellant] to find out about th[e] motion [to modify] until after he was out of [her] house." Terry agreed not to file the motion to modify "until [appellant] was out of [the complainant's] house." Terry also testified that he knew the complainant "was very afraid of [appellant] and what his actions were capable of and she didn't want to make him mad." And the complainant had "mention[ed] [appellant's] temper and how mad he would get about certain things and how controlling he was and how he didn't like her being around her family and other people."[68]

Further, Harris, in portions of her testimony, stated, without objection, that she had a conversation with the complainant on February 15, 2019. And that the complainant, prior to February 15, 2019, had met with Terry to discuss the filing of a motion to modify. Harris called the complainant "to ask if she wanted to go forward with the modification, and she said yes."[69] When Harris "asked [the

---

[68] Although appellant objected to this statement by Terry, appellant did not do so based on hearsay. *See Heidelberg*, 144 S.W.3d at 537 (objection stating one legal basis may not be used to support a different legal theory on appeal); *Broxton*, 909 S.W.2d at 918; *see also Clark*, 365 S.W.3d at 339 ("The point of error on appeal must comport with the objection made at trial.").

[69] Although appellant objected to this statement by Harris, appellant did not to do so based on hearsay. *See Heidelberg*, 144 S.W.3d at 537 (objection stating one legal basis may not be used to support a different legal theory on appeal); *Broxton*, 909

complainant] if she was ready to go ahead and file it," "[s]he said, no, that she had asked [appellant] to move out of the [her] residence and she didn't want to file it until he had moved out." The complainant "wanted to wait until [appellant had] moved out of her home."

Based on the foregoing, we hold that even if the trial court erred in overruling appellant's hearsay objection to the above-quoted portion of Terry's testimony, any error was harmless because it was duplicative of evidence admitted elsewhere without objection. *See Burks*, 876 S.W.2d at 897–98 (holding law enforcement officer's erroneously admitted hearsay testimony did not harm defendant when testimony of other trial witnesses proved same facts); *Washington*, 485 S.W.3d at 638–39 (noting error in admission of evidence may be rendered harmless when substantially same evidence is admitted elsewhere without objection).

We overrule appellant's sixth issue.

*3.    Weaver*

In his briefing related to his eighth issue, appellant complains about Weaver's testimony "concerning statements that she made in response to statements by [the complainant]." Specifically, appellant asserts that the trial court erred in admitting the following testimony of Weaver:

---

S.W.2d at 918; *see also Clark*, 365 S.W.3d at 339 ("The point of error on appeal must comport with the objection made at trial).

| | |
|---|---|
| [State]: | . . . Did you give [the complainant] any advice? |
| [Weaver]: | I did. |
| [State]: | Okay. What was your advice? |
| . . . . | |
| [Appellant's counsel]: | That's hearsay and relevance. |
| The Court: | Overrule as to what [Weaver] said . . . |
| . . . . | |
| [Weaver]: | I told [the complainant] that if [appellant] was cheating on her again that she should, as I had told her before, get legal things settled with him with regards to [the child]. And she had asked me -- |
| . . . . | |
| [Weaver]: | So I told her that after thinking about the situation that it would be best if she had an amicable split with [appellant], that -- and then she could go on with permanent changes to her house, like changing the locks. |

As previously explained, the erroneous admission of evidence constitutes non-constitutional error. *Coble*, 330 S.W.3d at 280; *Solomon*, 49 S.W.3d at 365. Non-constitutional error requires reversal only if it affects the substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b); *Barshaw*, 342 S.W.3d at 93–94. The defendant's substantial rights are affected "when the error had a substantial and

131

injurious effect or influence in determining the jury's verdict." *King*, 953 S.W.2d at 271. We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

We review the entire record to determine the effect or influence of the wrongfully admitted evidence on the jury's decision. *Id.*; *Motilla*, 78 S.W.3d at 355–56. In assessing the likelihood that the jury's decision was improperly influenced, we consider the testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94; *Motilla*, 78 S.W.3d at 355–56. The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis. *Neal*, 256 S.W.3d at 285; *see also Motilla*, 78 S.W.3d at 355–60. And we may consider closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error. *Motilla*, 78 S.W.3d at 355–56; *Hankins*, 180 S.W.3d at 182.

Appellant failed to assert in his briefing that he was harmed by the admission of the complained-of portion of Weaver's testimony. *See Petriciolet*, 442 S.W.3d at 653–55 (even if trial court improperly admitted evidence, appellate court must still determine whether defendant was harmed by erroneous admission);

132

*see, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding defendant waived complaint on appeal because he inadequately briefed issue by failing to address whether alleged error was harmless); *Chaves*, 630 S.W.3d at 555, 557–58 (holding defendant waived complaint trial court erred in admitting certain evidence because he "failed to adequately brief his assertion that he was harmed by the admission of" complained-of evidence); *Ford*, 2018 WL 1473948, at *6 (appellate court need not determine whether trial court erred in admitting exhibits where defendant did not argue in briefing that he was harmed by purportedly erroneous admission of exhibits); *Wilson*, 473 S.W.3d at 900–01 ("Here, we do not address whether the trial court erred in admitting the complained-of extraneous-offense evidence because even were we to conclude that the trial court erred in admitting such evidence, appellant, in his brief, does not argue that he was harmed by its admission.").

To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio*, 351 S.W.3d at 896–97; *Busby*, 253 S.W.3d at 673; *Chaves*, 630 S.W.3d at 555, 557–58. An appellate court has no obligation to construct and compose

issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See Wolfe*, 509 S.W.3d at 342–43; *Busby*, 253 S.W.3d at 673; *see also Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . ."). A brief that does not comply with Texas Rule of Appellate Procedure 38.1 presents nothing for an appellate court to review. *See Alvarado*, 912 S.W.2d at 210.

Although appellant argues that the trial court erred in admitting the complained-of portion of Weaver's testimony, appellant's briefing contains no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purportedly erroneous admission.[70] *See Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . .").

---

[70] In his reply brief, appellant attempts to redress his failure to "brief whether the admission of . . . Weaver's testimony over a hearsay objection resulted in harm under [a] non-constitutional harm analysis" by stating that "[i]t is clear that the testimony of . . . Weaver violated [a]ppellant's substantial rights to a fair trial." This is not sufficient. *See King v. State*, 17 S.W.3d 7, 23 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) ("Conclusory arguments . . . present nothing for our review."); *see also Chaves v. State*, 630 S.W.3d 541, 558 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding defendant inadequately briefed issue, where although he argued trial court erred in admitting exhibits, he only provided two conclusory sentences asserting he suffered harm); *Brown v. State*, Nos. 01-18-00594-CR, 01-18-00595-CR, 2020 WL 4210630, at *4 (Tex. App.—Houston [1st Dist.] July 23, 2020, no pet.) (mem. op., not designated for publication) (defendant waived appellate complaint where brief contained single conclusory sentence without citation to appropriate authority); *Linney v. State*, 401 S.W.3d 764, 783 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("We need not decide th[e] issue . . . because [defendant's] conclusory statement that the cumulative harm of the trial court's errors adversely affected his substantial rights is insufficient to maintain his burden to adequately brief the point of error.").

Accordingly, we hold that appellant has waived his complaint on appeal that the trial court erred in admitting the complained-of portion of Weaver's testimony due to inadequate briefing. *See, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Chaves*, 630 S.W.3d at 557–58 (holding defendant waived complaint trial court erred in admitting certain evidence because appellant's brief "contain[ed] no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the State's [evidence]"); *Ford*, 2018 WL 1473948, at *6; *Wilson*, 473 S.W.3d at 900–01 (defendant waived complaint trial court erred in admitting certain evidence where he failed to "identify[] the harm that he suffered as a result of the admission of the complained-of evidence").

### 4. *Kimberly*

In his briefing related to his ninth issue, appellant generally complains about Kimberly's testimony that the complainant "told her that her [tele]phone calls and text messages were being monitored." And appellant generally complains that Kimberly "read text messages from [the complainant]" during her testimony. But

appellant does not specifically identify in his briefing the portions of Kimberly's testimony about which he complains.[71]

To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, *with appropriate citations* to authorities and *to the record*." TEX. R. APP. P. 38.1(i) (emphasis added). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio*, 351 S.W.3d at 896–97; *Busby*, 253 S.W.3d at 673; *Chaves*, 630 S.W.3d at 555, 557–58.

Further, it is well settled that "mere references to pages in the record does not sufficiently identify testimony, the objections thereto, and the court's rulings thereon to constitute a ground of error." *Thomas*, 701 S.W.2d at 662; *see also Thierry v. State*, 288 S.W.3d 80, 86 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). An appellate court need not "scour the records" for support of appellant's assertion of error. *Ahmad v. State*, 615 S.W.3d 496, 502 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *Thierry*, 288 S.W.3d at 86; *see also Reule*, 483 S.W.3d at 615

---

[71] In the portion of his briefing where he states that Kimberly was erroneously "permitted to testify that [the complainant] told her that her [tele]phone calls and text messages were being monitored" and allowed to "read text messages from [the complainant]," appellant only discusses his objection to Kimberly's testimony based on the Confrontation Clause and does not mention any hearsay objections that he purportedly raised.

("[W]ithout proper citation, the voluminous nature of th[e] record makes it difficult to discern where there is any support for many of [appellant's] complaints.").

The appellant bears the burden of showing that the record supports the contentions raised and must specify the place in the record where matters upon which he relies or of which he complains are shown. *See Thomas*, 701 S.W.2d at 662; *In re C.A.J.*, No. 01-19-00704-CV, 2021 WL 243900, at *27 (Tex. App.—Houston [1st Dist.] Jan. 26, 2021, pet. denied) (mem. op.); *Gonzalez v. State*, No. 02-14-00229-CR, 2015 WL 9244986, at *4 (Tex. App.—Fort Worth Dec. 17, 2015, pet. ref'd) (mem. op., not designated for publication); *see also* TEX. R. APP. P. 38.1(i). Without appropriate record citations, a brief does not adequately present an issue for appeal. *See Toldson v. Denton Indep. Sch. Dist.*, No. 02-18-00394-CV, 2019 WL 6205245, at *13 (Tex. App.—Fort Worth Nov. 21, 2019, no pet.) (mem. op.); *see also Alvarado*, 912 S.W.2d at 210 (brief that does not comply with Texas Rule of Appellate Procedure 38.1 presents nothing for appellate court to review). Because appellant did not identify the portions of Kimberly's testimony about which he complains with appropriate citations to the record, we hold that appellant waived his complaint related to Kimberly's

137

testimony due to inadequate briefing.[72]  *See* TEX. R. APP. P. 38.1(i); *Lucio*, 351 S.W.3d at 896–97; *Busby*, 253 S.W.3d at 673; *Chaves*, 630 S.W.3d at 555, 557–58.

5.    *Gaston*

In his briefing related to his eleventh issue, appellant generally complains that Gaston testified "about historical events that occurred between [a]ppellant and [the complainant]."  Appellant fails to direct this Court to the specific portions of Gaston's testimony about which he complains, and instead tells the Court to "see [the] statement of facts" in his appellant's brief.

To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, *with appropriate citations* to authorities and *to the record*."  TEX. R. APP. P. 38.1(i) (emphasis added).  An appellant waives an issue on appeal if he does not adequately brief that issue by not

---

[72]    We also note that Janeth, the complainant's friend, testified that prior to her death, the complainant "express[ed] . . . concern" about Janeth sending her text messages because "it appear[ed] as if [her] text messages were being monitored."  And Yolanda, the complainant's mother, testified about the complainant's text messages being monitored by appellant.  Appellant does not complain on appeal that the trial court erred in admitting Janeth's or Yolanda's testimony about the complainant's text messages being monitored.  Thus, to the extent that appellant has not waived his complaint about Kimberly's testimony due to inadequate briefing, the testimony about which he generally complains is duplicative of evidence admitted elsewhere that he has not challenged on appeal.  *See Burks v. State*, 876 S.W.2d 877, 897–98 (Tex. Crim. App. 1994) (holding law enforcement officer's erroneously admitted hearsay testimony did not harm defendant when testimony of other trial witnesses proved same facts); *Washington v. State*, 485 S.W.3d 633, 638–39 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (noting error in admission of evidence may be rendered harmless when substantially same evidence is admitted elsewhere without objection).

providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio*, 351 S.W.3d at 896–97; *Busby*, 253 S.W.3d at 673; *Chaves*, 630 S.W.3d at 555, 557–58.

Further, it is well settled that "mere references to pages in the record does not sufficiently identify testimony, the objections thereto, and the court's rulings thereon to constitute a ground of error." *Thomas*, 701 S.W.2d at 662; *see also Thierry*, 288 S.W.3d at 86. An appellate court need not "scour the records" for support of appellant's assertion of error. *Ahmad*, 615 S.W.3d at 502; *Thierry*, 288 S.W.3d at 86; *see also Reule*, 483 S.W.3d at 615 ("[W]ithout proper citation, the voluminous nature of th[e] record makes it difficult to discern where there is any support for many of [appellant's] complaints.").

As previously explained, the appellant bears the burden of showing that the record supports the contentions raised and must specify the place in the record where matters upon which he relies or of which he complains are shown. *See Thomas*, 701 S.W.2d at 662; *In re C.A.J.*, 2021 WL 243900, at *27; *Gonzalez*, 2015 WL 9244986, at *4; *see also* TEX. R. APP. P. 38.1(i); *see also Reule*, 483 S.W.3d at 615 ("[W]ithout proper citation, the voluminous nature of th[e] record makes it difficult to discern where there is any support for many of [appellant's] complaints."). Without appropriate record citations, a brief does not adequately present an issue for appeal. *See Toldson*, 2019 WL 6205245, at *13; *see also*

*Alvarado*, 912 S.W.2d at 210 (brief that does not comply with Texas Rule of Appellate Procedure 38.1 presents nothing for appellate court to review). Because appellant did not identify the portions of Gaston's testimony about which he complains with appropriate citations to the record, we hold he has waived his complaint related to Gaston's testimony due to inadequate briefing.

Additionally, we note that appellant, in his briefing, fails to argue, explain, and provide substantive analysis and citations to authorities to show that he was harmed by the trial court's purportedly erroneous admission of Gaston's testimony "about historical events that occurred between [a]ppellant and [the complainant]."[73] An appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See Wolfe*, 509 S.W.3d at 342–43; *Busby*, 253 S.W.3d at 673;

---

[73] In his reply brief, appellant attempts to redress his failure to explain "how . . . Gaston's testimony and notes . . . caused him to suffer harm under [a] non-constitutional harm analysis" by stating that "[i]t is clear that the testimony of . . . Gaston . . . violated [a]ppellant's substantial rights to a fair trial." This is not sufficient. *See King*, 17 S.W.3d at 23 ("Conclusory arguments . . . present nothing for our review."); *see also Chaves*, 630 S.W.3d at 558 (holding defendant inadequately briefed issue, where although he argued trial court erred in admitting exhibits, he only provided two conclusory sentences asserted that he suffered harm); *Brown*, 2020 WL 4210630, at *4 (defendant waived appellate complaint where brief contained single conclusory sentence without citation to appropriate authority); *Linney*, 401 S.W.3d at 783 ("We need not decide th[e] issue . . . because [defendant's] conclusory statement that the cumulative harm of the trial court's errors adversely affected his substantial rights is insufficient to maintain his burden to adequately brief the point of error.").

*see also Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . .").

Thus, we further hold that appellant waived his complaint related to Gaston's testimony due to inadequate briefing because appellant failed to assert in his briefing that he was harmed by the admission of Gaston's testimony "about historical events that occurred between [a]ppellant and [the complainant]." *See, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Chaves*, 630 S.W.3d at 557–58 (holding defendant waived complaint trial court erred in admitting certain evidence because appellant's brief "contain[ed] no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the State's [evidence]"); *Ford*, 2018 WL 1473948, at *6; *Wilson*, 473 S.W.3d at 900–01 (defendant waived complaint trial court erred in admitting certain evidence where he failed to "identify[] the harm that he suffered as a result of the admission of the complained-of evidence").

## C.    Confrontation Clause

In his fifth issue, appellant argues that the trial court erred in admitting the "testimony of [a] conversation between . . . Harris," a paralegal who worked with the complainant's attorney, and the complainant because appellant "objected to any

141

statement made by [the complainant] to . . . Harris as . . . violating [his] right to confront" and appellant "was not afforded the opportunity to cross-examine" the complainant. (Internal quotations omitted.) In his seventh issue, appellant argues that the trial court erred in admitting "statements made by [the complainant] to her lawyer . . . Terry concerning [a]ppellant" because appellant made a "confrontation objection" at trial and appellant "was not afforded the opportunity to cross-examine" the complainant. (Internal quotations omitted.) In his tenth issue, appellant argues that the trial court erred in admitting the testimony of Kimberly, the complainant's cousin, that the complainant "told her that her [tele]phone calls and text messages were being monitored" and erred in admitting copies of the "text messages from [the complainant] concerning her belief that her text messages were being monitored" because appellant made a "confrontation objection" at trial and appellant "was not afforded the opportunity to cross-examine" the complainant. (Internal quotations omitted.) In his twelfth issue, appellant argues that the trial court erred in admitting "testimony [of] . . . Gaston, [the complainant's] therapist, concerning details of events that occurred during the relationship between [the complainant] and [a]ppellant" because appellant made a "confrontation objection" at trial and appellant "was not afforded the opportunity to cross-examine" the complainant. (Internal quotations omitted.).

142

The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI; *see also Sohail v. State*, 264 S.W.3d 251, 258 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) ("A defendant has a constitutional right to confront and cross-examine the witnesses against him."). The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *see also Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) (Confrontation Clause "guarantees [a] defendant a face-to-face meeting with witnesses appearing before the trier of fact"). The Confrontation Clause bars the admission of testimonial statements of a witness who does not appear at trial unless that witness is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *Russeau*, 171 S.W.3d at 880.

Here, we will presume, for purposes of this opinion, that the trial court erred in admitting the complained-of testimony of Harris, Terry, Kimberly, and Gaston and the complained-of text-message evidence because the admission of such evidence violated appellant's Sixth Amendment right "to be confronted with the witnesses against him." *See* U.S. CONST. amend. VI. But, even if the trial court's

erroneous admission of evidence constituted a violation of appellant's constitutional rights, we must still perform a harm analysis and must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. *See* TEX. R. APP. P. 44.2(a); *Henriquez v. State*, 580 S.W.3d 421, 429 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd); *see also Lee v. State*, 418 S.W.3d 892, 899 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("A Confrontation Clause violation is constitutional error that requires reversal unless we conclude beyond a reasonable doubt that the error was harmless.").

In conducting the harm-analysis, the critical inquiry is not whether the evidence supported the verdict absent the erroneously admitted evidence, but rather "the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations." *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007); *see also Henriquez*, 580 S.W.3d at 429. We must "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001). While our review must focus on the error and its effect, "the presence of other overwhelming evidence that was properly admitted which supports the material fact to which the inadmissible evidence was directed may be an important factor in the evaluation of harm." *Wall v. State*, 184 S.W.3d 730, 746 (Tex. Crim. App. 2006). In

144

determining if the constitutional error may be declared harmless beyond a reasonable doubt, we may consider: (1) how important the out-of-court statement was to the State's case; (2) whether the out-of-court statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and (4) the overall strength of the State's case. *Scott*, 227 S.W.3d at 690; *Gutierrez v. State*, 516 S.W.3d 593, 599 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

Appellant fails to assert in his briefing that he was harmed by the admission, over his Confrontation-Clause objection, of the complained-of portions of Harris's, Terry's, Kimberly's, and Gaston's testimony and the complained-of text-message evidence. *See Petriciolet*, 442 S.W.3d at 653–55 (even if trial court improperly admitted evidence, appellate court must still determine whether defendant was harmed by erroneous admission); *see, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding defendant waived complaint on appeal because he inadequately briefed issue by failing to address whether alleged error was harmless); *White v. State*, No. 01-20-00238-CR, 2022 WL 2674214, at *7 (Tex. App.—Houston [1st Dist.] July 12, 2022, no pet.) (mem. op., not designated for publication) (holding defendant's challenge to testimony based on Confrontation Clause waived because defendant "fail[ed] to address in any way how he was harmed by its admission, an element he [was] required to establish on appeal"); *Bradshaw v. State*, No. 01-19-00611-CR,

2020 WL 7062589, at *5 (Tex. App.—Houston [1st Dist.] Dec. 3, 2020, no pet.) (mem. op., not designated for publication) (defendant waived Confrontation-Clause complaint where he failed to argue he was harmed by allegedly erroneous admission of evidence); *Crawford v. State*, 595 S.W.3d 792, 801 (Tex. App.—San Antonio 2019, pet. ref'd) (holding defendant waived complaint trial court erred in admitting certain testimony that violated his right to confrontation because defendant "d[id] [not] explain how he was harmed as a result"); *Ford*, 2018 WL 1473948, at *6 (appellate court need not determine whether trial court erred in admitting exhibits where defendant did not argue in briefing that he was harmed by admission of exhibits); *Wilson*, 473 S.W.3d at 900–01 ("Here, we do not address whether the trial court erred in admitting the complained-of . . . evidence because even were we to conclude that the trial court erred in admitting such evidence, appellant, in his brief, does not argue that he was harmed by its admission.").

As previously explained, to assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by not presenting supporting arguments, substantive analysis, and citation to authorities. *See id.*; *Lucio*, 351 S.W.3d at 896–97; *Busby*, 253 S.W.3d at 673; *Chaves*, 630 S.W.3d at

146

555, 557–58.  An appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant.  *See Wolfe*, 509 S.W.3d at 342–43; *Busby*, 253 S.W.3d at 673; *see also Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . .").  A brief that does not comply with Texas Rule of Appellate Procedure 38.1 presents nothing for an appellate court to review.  *See Alvarado*, 912 S.W.2d at 210.

Although appellant argues that the trial court erred in admitting certain complained-of testimony and text-message evidence in violation of his Sixth Amendment right to confrontation, his briefing contains no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission.[74]  *See Wyatt*, 23 S.W.3d at 23 n.5

---

[74]  In his reply brief, appellant attempts to redress his "failure to brief the harm resulting from the admission" of the complained-of testimony and the complained-of text-message evidence, but even in his reply brief appellant fails to explain "the likelihood that the [trial court's purported] constitutional error was actually a contributing factor in the jury's deliberations."  *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007); *see also Henriquez v. State*, 580 S.W.3d 421, 429 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd).  And he fails to analyze: (1) how important the complained-of out-of-court statements were to the State's case; (2) whether the complained-of out-of-court statements were cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the complained-of out-of-court statements on material points; and (4) the overall strength of the State's case.  *Scott*, 227 S.W.3d at 690; *Gutierrez v. State*, 516 S.W.3d 593, 599 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).  Appellant, in his reply brief, does not remedy his failure to provide argument, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the

("We will not make appellant's arguments for him . . . ."). Accordingly, we hold that appellant waived, due to inadequate briefing, his complaints in his fifth, seventh, tenth, and twelfth issues that the trial court erred in admitting the complained-of testimony of Harris, Terry, Kimberly, and Gaston and the complained-of text-message evidence in violation of his Sixth Amendment right to confrontation. *See, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Chaves*, 630 S.W.3d at 557–58 (holding defendant waived complaint trial court erred in admitting certain evidence because appellant's brief "contain[ed] no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the State's [evidence]"); *Ford*, 2018 WL 1473948, at *6; *Wilson*, 473 S.W.3d at 900–01 (defendant waived complaint trial court erred in admitting certain evidence where he failed to "identify[] the harm that he suffered as a result of the admission of the complained-of evidence").

---

complained-of testimony and the complained-of text-message evidence. *Cf. Cantu v. State*, No. 13-08-00666-CR, 2010 WL 4922914, at *3 (Tex. App.—Corpus Christi–Edinburg Nov. 30, 2010, no pet.) (mem. op., not designated for publication) (where defendant's only discussion of harm was contained in his reply brief, defendant did not remedy his failure to perform harm analysis); *see also Ward v. State*, No. 14-15-00473-CR, 2016 WL 6238339, at *4 (Tex. App.— Houston [14th Dist.] Oct. 25, 2016, pet. ref'd) (argument not raised until reply brief was waived).

## Motion for Mistrial

In his thirteenth issue, appellant argues that the trial court erred in denying his motion for mistrial because the State asked Detective Hawkins "whether [a]ppellant intentionally caused the death of [the complainant] by causing a blunt trauma injury to her head" and "all witnesses, whether expert or lay[,] . . . [are prohibited] from opining about [the] guilt or innocence of [the] accused."

We review the denial of a motion for mistrial for an abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). In applying an abuse-of-discretion standard of review, we uphold the trial court's decision to deny a mistrial "if it was within the zone of reasonable disagreement." *Id.*; *see also Griffin v. State*, 571 S.W.3d 404, 416 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). In determining whether a trial court abused its discretion by denying a mistrial, we balance three factors: (1) the severity of the misconduct (including its prejudicial effect), (2) the effectiveness of the curative measures taken, and (3) the certainty of the conviction or punishment assessed absent the misconduct. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Verdine v. State*, No. 01-18-00884-CR, 2020 WL 1584468, at *9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2020, pet. ref'd) (mem. op., not designated for publication).

"Mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880,

884 (Tex. Crim. App. 2009) (internal quotations omitted); *see also Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011) (granting motion for mistrial is appropriate only when "the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant" (internal quotations omitted)); *Hawkins*, 135 S.W.3d at 77 (mistrial is trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile" (internal quotations omitted)); *Williams*, 417 S.W.3d at 175 ("A mistrial is an extreme remedy and should be exceedingly uncommon."). Otherwise, when the prejudice is curable, an instruction by the trial court to disregard eliminates the need for a mistrial. *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004).

Appellant's complaint that the trial court erred in denying his motion for mistrial relates to the following portion of Detective Hawkins's testimony:

| [State]: | Did this defendant intentionally cause the death of [the complainant] by causing blunt trauma to her head? |
| --- | --- |
| [Appellant's counsel]: | I'm going -- |
| [Hawkins]: | Yes. |
| [Appellant's counsel]: | -- to object. That calls for speculation and invades the province of the jury. |
| The Court: | Sustained. |

150

| [Appellant's counsel]: | I ask that the jury be instructed to disregard the statement. |
| --- | --- |
| The Court: | The answer given after the objection was made will be disregarded. |
| [Appellant's counsel]: | And I'm required to move for a mistrial. |
| The Court: | Denied. |

To preserve error for appellate review, the record must show an objection "stat[ing] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a); *see also Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). A party fails to preserve error when the contention urged on appeal does not match with the specific complaint made in the trial court. *Lovill v. State*, 319 S.W.3d 687 691–92 (Tex. Crim. App. 2009); *see also Clark*, 365 S.W.3d at 339 ("The point of error on appeal must comport with the objection made at trial."). In other words, an objection stating one legal basis may not be used to support a different legal theory on appeal. *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *see also Ex parte Nelson*, No. 01-19-00325-CR, 2019 WL 6315197, at *3 (Tex. App.— Houston [1st Dist.] Nov. 26, 2019, pet. ref'd) (mem. op., not designated for publication) ("[I]ssues on appeal must track the arguments made in the trial

court."); *Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd) ("Where a trial objection does not comport with the issue raised on appeal, the appellant has preserved nothing for review.").

On appeal, appellant argues that the trial court erred in denying his motion for mistrial after Detective Hawkins testified that appellant "intentionally cause[d] the death of [the complainant] by causing blunt trauma to her head" because Hawkins was prohibited from expressing an opinion during his testimony "about [the] guilt or innocence of" appellant. *See Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974). But at trial, appellant did not object to Hawkins's testimony because it constituted an improper opinion by a lay witness. *See* TEX. R. EVID. 701. Instead, appellant objected that Hawkins's testimony "call[ed] for speculation" and "invade[d] the province of the jury."[75] *See Coggins v. State*, No. 04-17-00532-CR, 2018 WL 5927980, at *3 (Tex. App.—San Antonio Nov. 14, 2018, pet. ref'd) (mem. op., not designated for publication) (explaining difference between speculation objection and objection for improper lay witness opinion); *Liller v. State*, No. 08-15-00125-CR, 2018 WL 1959679, at *3–4 (Tex. App.—El Paso Apr. 26, 2018, pet. ref'd) (not designated for publication) (holding defendant

---

[75] We note that appellant's objection that Detective Hawkins's testimony "invade[d] the province of the jury" is no longer a valid objection under Texas law following the adoption of Texas Rule of Evidence 704. *See Ortiz v. State*, 834 S.W.2d 343, 348 (Tex. Crim. App. 1992), *superseded by statute on other grounds as stated in Ellison v. State*, 201 S.W.3d 714, 717 (Tex. Crim. App. 2006); *Mock v. State*, 848 S.W.2d 215, 225 (Tex. App.—El Paso 1992, pet. ref'd).

failed to preserve complaint testimony improper under Texas Evidence Rule 701 when only raised speculation objection at trial); *Burks v. State*, No. 05-13-00852-CR, 2014 WL 5141663, at \*5 (Tex. App.—Dallas Oct. 14, 2014, no pet.) (mem. op., not designated for publication) (defendant did not preserve his complaint trial court erred in admitting improper lay witness opinion, where only made speculation objection in trial court); *Hurst v. State*, 406 S.W.3d 617, 621–23 (Tex. App.—Eastland 2013, no pet.) (explaining "province of the jury" objection "is too imprecise to preserve error" and noting such objection did not preserve error for appellate complaint under Texas Rule of Evidence 701 (internal quotations omitted)); *Contreras v. State*, No. 12-10-00045-CR, 2011 WL 3273966, at \*1–4 (Tex. App.—Tyler July 29, 2011, pet. ref'd) (mem. op., not designated for publication) (defendant's complaint on appeal that trial court erred in allowing impermissible testimony on ultimate issue of guilt not preserved by invading-province-of-jury objection at trial); *Hawkins v. State*, No. 08-07-00180-CR, 2009 WL 783257, at \*2 (Tex. App.—El Paso Mar. 26, 2009, no pet.) (not designated for publication) (defendant's invading-province-of-jury objection at trial did not preserve appellate complaint under Texas Rule of Evidence 701); *see also* TEX. R. EVID. 602, 701.

"Where a trial objection does not comport with the issue raised on appeal, [an] appellant . . . preserve[s] nothing for [our] review." *Wright*, 154 S.W.3d at

241; *see also Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (appellate court should not address merits of issue not preserved for appeal). Because appellant's complaint on appeal does not match the specific objections he made in the trial court in response to the complained-of portion of Detective Hawkins's testimony, we hold that appellant has not preserved his complaint that the trial court erred in denying his motion for mistrial.

**Motion for New Trial**

In his fourteenth issue, appellant argues that the trial court erred in denying his motion for new trial because "of the evidence presented." In his fifteenth issue, appellant argues that the trial court erred in failing to consider "evidence or arguments presented in writing in accordance with the trial court's instructions" when ruling on his motion for new trial because such "evidence and pleadings were timely delivered."

We review a trial court's denial of a motion for new trial for an abuse of discretion. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012). We view the evidence in the light most favorable to the trial court's ruling and uphold it if it is within the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We do not substitute our judgment for that of the trial court; rather we decide whether the trial court's decision was arbitrary or

unreasonable.  *Webb*, 232 S.W.3d at 112; *Biagas v. State*, 177 S.W.3d 161, 170 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Appellant's argument in his briefing related to his fourteenth and fifteenth issues is difficult to discern.[76]  Yet, Texas Rule of Appellate Procedure 38.1 requires an appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities."  TEX. R. APP. P. 38.1(i).  An appellant waives an issue when his briefing does not adhere with rule 38.1's clarity requirement.  *See Aybar v. State*, Nos. 12-09-00320-CR, 12-09-00321-CR, 2010 WL 3158583, at *1 (Tex. App.—Tyler Aug. 11, 2010, no pet.) (mem. op., not designated for publication); *Muniz v. State*, Nos. 12-07-00363-CR to 12-07-00365-CR, 2009 WL 1492838, at *4 (Tex. App.—Tyler May 29, 2009, no pet.) (mem. op., not designated for publication) (appellant waives issue when he "fail[s] to make a[] cogent argument"); *cf. Lara v. State*, No. 04-14-00553-CR, 2015 WL 9487578, at *4 (Tex. App.—San Antonio Dec. 30,

---

[76]  The State argues that appellant waived his motion-for-new-trial issues because they are multifarious.  A multifarious issue is one that embraces more than one specific ground.  *Stults v. State*, 23 S.W.3d 198, 205 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *see also Prihoda v. State*, 352 S.W.3d 796, 801 (Tex. App.—San Antonio 2011, pet. ref'd) (defendant's complaint was multifarious "because it [was] based on more than one legal theory and raise[d] more than one specific complaint").  We have discretion to "refuse to review a multifarious issue or we may elect to consider the issue if we are able to determine, with reasonable certainty, the alleged error about which the complaint is made."  *Prihoda*, 352 S.W.3d at 801; *see also Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010).

2015, no pet.) (mem. op., not designated for publication) (holding defendant waived ineffective-assistance-of-counsel complaint where his argument in brief was difficult to discern). To the extent we can discern appellant's arguments related to the trial court's denial of his motion for new trial, we will address them below. *Cf. Wilson v. State*, No. 04-15-00471-CR, 2016 WL 4124068, at *1 (Tex. App.—San Antonio Aug. 3, 2016, pet. ref'd) (mem. op., not designated for publication) (addressing portion of defendant's complaint that appellate court could discern from his briefing).

Appellant, in his briefing, appears to complain about the trial court's failure to consider Defense Exhibit 7, an audio recording of an interview of former Brazoria County district clerk Rhonda Barchak, in ruling on appellant's motion for new trial. At the hearing on appellant's motion for new trial, Barchak testified that she previously was the district clerk for Brazoria County. And she previously gave a statement to a Texas Ranger. Barchak asserted her Fifth Amendment privilege against self-incrimination and refused to answer any further questions at the new-trial hearing. *See* U.S. CONST. amend. V; *Chapman v. State*, 115 S.W.3d 1, 5 (Tex. Crim. App. 2003) ("[E]very person has the right to avoid self-incrimination by exercising the privilege provided him by the Fifth Amendment . . . . He may choose to remain silent rather than to respond to questions when the answers to those questions would tend to incriminate him." (internal footnote omitted)).

156

On appeal, appellant asserts that Defense Exhibit 7, the audio recording of Barchak's interview with a Texas Ranger, was admissible under Texas Rule of Evidence 803(24) as "a statement against interest." *See* TEX. R. EVID. 803(24); *Walter v. State*, 267 S.W.3d 883, 889–90 (Tex. Crim. App. 2008) (explaining generally "the hearsay rule excludes any out-of-court statement offered to prove the truth of the matter asserted," but exception to hearsay rule allows admissions of statements made against declarant's interest). But appellant does not adequately brief his complaint about the trial court's failure to consider Defense Exhibit 7 when ruling on appellant's motion for new trial.

As previously noted, to assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio*, 351 S.W.3d at 896–97; *Busby*, 253 S.W.3d at 673; *Chaves*, 630 S.W.3d at 555, 557–58. Here, appellant has not provided a clear and concise argument, substantive analysis, or citation to appropriate authority to support his complaint that the trial court erred when it did not consider Defense Exhibit 7

when ruling on appellant's motion for new trial.[77]  *See* TEX. R. APP. P. 38.1(i); *see also Dowling v. State*, 608 S.W.3d 896, 901–02 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (appellant who does not provide citation to appropriate authorities to support his argument waives issue); *Garcia v. State*, No. 13-08-00740-CR, 2010 WL 4901389, at *5 (Tex. App.—Corpus Christi–Edinburg Nov. 30, 2010, no pet.) (mem. op., not designated for publication) (appellant's failure to provide clear and concise argument with citation to appropriate authority to support his contention waived issue).

As the Texas Court of Criminal Appeals has emphasized, an appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant.  *See Wolfe*, 509 S.W.3d at 342–43; *Busby*, 253 S.W.3d at 673; *see also Wyatt*, 23 S.W.3d at 23 n.5

---

[77]  For instance, appellant wholly fails to address in his briefing whether the declarant, Barchak, realized that her statement during her interview with the Texas Ranger subjected her to criminal liability at the time she made her statement—a necessary part of the analysis of whether Defense Exhibit 7 was admissible as a statement against interest.  *See* TEX. R. APP. P. 38.1(i); *Walter v. State*, 267 S.W.3d 883, 890–91 (Tex. Crim. App. 2008) (for statement to be admissible under Texas Rule of Evidence 803(24) it must be established that statement, when considering all circumstances, subjected declarant to criminal liability, declarant realized that when she made statement, and sufficient corroborating circumstances clearly indicated truthfulness of statement); *see also Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000) ("We will not make appellant's arguments for him . . . ."); *Alvarado*, 912 S.W.2d at 210 (where appellant's point of error inadequately briefed, appellant "presents nothing for our review"); *Lawton v. State*, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995) (failure to adequately brief issue, either by failing to specifically argue and analyze one's position or provide authorities and record citations, waives any error on appeal), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998).

("We will not make appellant's arguments for him . . . ."). A brief that does not comply with Texas Rule of Appellate Procedure 38.1 presents nothing for an appellate court to review. *See Alvarado*, 912 S.W.2d at 210.

Further, we note that appellant, to the extent that he appears to assert in his briefing, that the trial court erred in failing to consider "material disclosed during the new trial hearing," he does so relying on a docket sheet entry from October 20, 2021—five days after the hearing on appellant's motion for new trial and a day after the trial court signed its order denying appellant's motion for new trial. That docket sheet entry states: "All exhibits requested to be considered after evidence was closed were not considered since opposing counsel had no opportunity to be heard." It is unclear how the docket sheet entry supports appellant's assertion that the trial court erred in failing to consider "material disclosed during the new trial hearing." In any event, we do not consider it. Docket sheet entries are not part of the record because they are inherently unreliable and lack the formality of orders and judgments. *State v. Shaw*, 4 S.W.3d 875, 878 (Tex. App.—Dallas 1999, no pet.); *see also Sellers v. State*, No. 01-12-00163-CR, 2013 WL 3868167, at *3 (Tex. App.—Houston [1st Dist.] July 23, 2013, no pet.) (mem. op., not designated for publication) (recitations on docket sheet are not evidence).

Appellant cites nothing in the actual record to support his assertion. Thus, we hold that appellant has not shown that the trial court failed to consider certain unidentified "material disclosed during the new trial hearing."

Finally, to the extent that appellant has attempted to raise any other complaints in his fourteenth and fifteenth issues related to the trial court's denial of his motion for new trial, we hold that they are waived due to inadequate briefing. *See* TEX. R. APP. P. 38.1; *Torres v. State*, 979 S.W.2d 668, 675–76 (Tex. App.—San Antonio 1998, no pet.) (where appellant's argument was confusing and appellate court could not "discern what contention [a]ppellant [was] making," nothing was presented to court for review); *see also Kennedy v. Staples*, 336 S.W.3d 745, 754 (Tex. App.—Texarkana 2011, no pet.) (where appellant's complaints lacked coherence, declining to address any further arguments that appellate court could not clearly glean from appellant's briefing).

## Abatement

In his sixteenth issue, appellant argues that this Court should abate this appeal and remand the case to the trial court "to consider all of the evidence discovered during the October 15, 2021 [motion-for-new-trial] hearing" because the trial court, in ruling on appellant's motion for new trial, "refused to consider the evidence or information produced on October 15, 2021."

To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, with *appropriate citations* to authorities and to the record." TEX. R. APP. P. 38.1(i) (emphasis added). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio*, 351 S.W.3d at 896–97; *Busby*, 253 S.W.3d at 673; *Chaves*, 630 S.W.3d at 555, 557–58. An appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See Wolfe*, 509 S.W.3d at 342–43; *Busby*, 253 S.W.3d at 673; *see also Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . ."). A brief that does not comply with Texas Rule of Appellate Procedure 38.1 presents nothing for an appellate court to review. *See Alvarado*, 912 S.W.2d at 210.

In his briefing, appellant provides no support for his assertion that this Court should abate this appeal, nor has he provided this Court with any meaningful analysis to support his request.[78] *See Jones v. State*, No. 11-19-00251-CR, 2021 WL 3413794, at *3 (Tex. App.—Eastland Aug. 5, 2021, no pet.) (mem. op., not designated for publication) (holding defendant, who failed to provide support for

---

[78] To the extent that appellant, in his reply brief, attempts to direct this Court to purportedly relevant authority, we note that the authority cited does not support his abatement request. *See* TEX. R. APP. P. 38.1(i) (requiring citation to *appropriate authority*).

161

his appellate complaint, waived his complaint for appellate review); *Coffey v. State*, Nos. 10-17-00057-CR, 10-17-00058-CR, 2019 WL 2557499, at *3 (Tex. App.—Waco June 19, 2019, no pet.) (mem. op., not designated for publication) (defendant who provided no support for complaint waived issue on appeal).

Further, we previously denied appellant's request for abatement on February 1, 2022. Appellant provides no argument or authority to support our reconsideration of his request for abatement. Thus, we hold that appellant has waived, due to inadequate briefing, his argument that this Court should abate this appeal and remand the case to the trial court "to consider all of the evidence discovered during the October 15, 2021 [motion-for-new-trial] hearing." *See* TEX. R. APP. P. 38.1(i); *Osuna v. State*, No. 14-15-00871-CR, 2016 WL 5853290, at *3 (Tex. App.—Houston [14th Dist.] Oct. 6, 2016, no pet.) (mem. op., not designated for publication) (overruling defendant's abatement request where defendant cited no authority requiring abatement).

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).